## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO

| | | |
|---|---|---|
| GREAT NORTHERN INSURANCE COMPANY, et al., | ) ) | Case No.:  2:11CV1153 |
| | ) | |
| Plaintiffs, | ) | JUDGE MARBLEY |
| | ) | |
| vs. | ) | MAGISTRATE JUDGE ABEL |
| | ) | |
| BMW OF NORTH AMERICA LLC, et al., | ) ) | |
| | ) | |
| Defendants. | ) ) ) | **DEFENDANTS' MOTION IN LIMINE TO EXCLUDE THE TESTIMONY OF RICHARD A. CLARKE** |

Pursuant to Fed. R. Evid. 104 and 702, Defendants BMW of North America LLC and Bayerische Motoren Werke AG (collectively "Defendants") move this Court for an order excluding Richard A. Clarke from testifying as an alleged expert witness in this case.  Clarke is not qualified to render expert opinions as to the alleged design defect in the vehicle, how the vehicle's design caused the fire, or his proposed "alternative design."

A memorandum in support of this motion is attached.

Respectfully submitted,

/s/ John R. Conley
Lawrence A. Sutter (0042664)
John Conley (0084079)
Sutter O'Connell
3600 Erieview Tower
1301 East 9th Street
Cleveland, Ohio 44114
*Attorney for Defendants,*
*BMW of North America, LLC and*
*Bayerische Motoren Werke AG*

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO**

| | | |
|---|---|---|
| GREAT NORTHERN INSURANCE COMPANY, et al., | ) ) ) | Case No.:  2:11CV1153 |
| Plaintiffs, | ) ) | JUDGE MARBLEY |
| vs. | ) ) | MAGISTRATE JUDGE ABEL |
| BMW OF NORTH AMERICA LLC, et al., | ) ) ) | |
| Defendants. | ) ) ) | **MEMORANDUM IN SUPPORT OF MOTION IN LIMINE TO EXCLUDE THE TESTIMONY OF RICHARD E. CLARKE** |

## I.      INTRODUCTION

Plaintiffs Great Northern Insurance Company and Pacific Indemnity  Insurance Company's ("Plaintiffs") proposed expert, Richard E. Clarke, is not a professional mechanical or design engineer, does not have a mechanical or design engineering degree (or any relevant education or training), and has no experience in designing automobiles.  Therefore, Clarke cannot testify as to the alleged design defect in the vehicle at issue, how the purported design defect caused the vehicle to catch on fire, and an alternative design that purportedly would have prevented the accumulation of debris in the engine compartment.

This case involves Jean Patrick's 2007 BMW 328xi (the "Vehicle"), which caught on fire and burned down her house.  Plaintiffs paid Patrick for the property damage under her insurance policies and now pursue this subrogation action against Defendants.  Plaintiffs and Defendants agree that the fire resulted from the ignition of organic debris that was accumulated in the Vehicle's engine compartment.

2

The primary issue then is how the debris became accumulated.  Defendants will establish that a rodent purposefully accumulated the debris.  Alternatively, Plaintiffs' proposed expert, Richard Clarke, offers the following theories:  (1) the organic debris somehow entered the Vehicle's engine compartment through "openings" around the hood; (2) over a number of years, debris became "trapped" on the Vehicle's under-engine compartment cover; and (3) a redesign of the Vehicle's under-engine compartment cover would allow the debris to pass through the engine compartment, thereby preventing the specific fire at issue.

Before offering his theories to a jury, Clarke must qualify as an expert under a three-prong test.  First, Clarke must be qualified according to his knowledge, skill, experience, training, or education.  Second, his testimony must be reliable under the *Daubert* factors.  Third, Clarke's testimony must be relevant, in that it will help the trier of fact understand factual issues.  Plaintiffs have the burden of proving that Clarke satisfies these tests.  Plaintiffs cannot.

First, Clarke is not qualified to offer expert testimony criticizing the Vehicle's design, or to speculate as to how aspects of the Vehicle's design resulted in the fire.  Clarke is an auto mechanic and "vehicle fire investigator."  He is not a professional mechanical or design engineer, does not have a mechanical or design engineering degree (or any relevant education or training), and has no relevant experience in designing automobiles or automobile components.  Clarke readily admits that he is not an expert in vehicle design, let alone an expert in designing the specific component parts (i.e., hood, under-engine compartment cover and stiffening plate) that are at issue in this case.

Second, Clarke's theories are not reliable, as they have not been tested, critically analyzed, or subject to peer review.  Moreover, his theories are not based on sufficient facts or data.  Based solely on seeing debris in the Vehicle and a couple of other unidentified BMW's, Clarke concludes that the debris had to come through "openings" in the hood and the Vehicle's under-engine compartment cover prevented the debris from escaping.  He assumes, without any testing or analysis, because there was debris in the engine there has to be a defect in the Vehicle.  With this assumption, he develops a "primitive" alternative design for the stiffening plate that has not been tested or reviewed by engineers.

Third, Clarke's theories are irrelevant because they are speculative, do not "fit" the facts of this case, and would not assist a jury in coming to a well-reasoned determination.  Indeed, Clarke ignores the relevant facts (e.g., this is the only case of a BMW similar to the Vehicle catching on fire because of debris in the engine, Defendants' aerodynamic testing, etc.) and makes unreasonable assumptions (e.g. if there is debris in the engine, there must be a defect that allowed the debris to accumulate).  An opinion based on incorrect facts and assumptions will not help a jury understand evidence or determine a factual issue.

Therefore, as discussed below, Clarke should be precluded from offering his theories in this case.

II.     **FACTS**

    A.     **The Vehicle's Use and Fire.**

Jean Patrick leased the Vehicle in May of 2007.  *See Jean Patrick deposition, pg. 20, attached as Exhibit F.*  She drove the vehicle for approximately three years without any problems at all.  *Id., pgs. 37-38.*  Patrick always stored the Vehicle in a garage at home *and* work.  *Id., pgs. 37; 40.*  She had no recollection of ever parking the Vehicle in any area where substantial debris had accumulated.  *Id., pg. 42.*  After her retirement in 2007, she drove the Vehicle to her frame shop almost every day.  *Id., pgs. 44-45.*  At the frame shop, she parked the

Vehicle in a parking lot with no trees around and no debris accumulation. *Id., pgs. 45-47.*

On the afternoon of March 16, 2010, while driving home, Patrick started to smell smoldering or burning leaves but was not sure where the smell was coming from. *Id., pgs. 53-63.* Once home, she pulled the vehicle into her garage and upon exiting the vehicle saw a "wisp of smoke" from the passenger-side front fender area. *Id., pgs. 53-63.* Within seconds, she looked back into the garage and witnessed the vehicle going up in flames. *Id., pgs. 53-63.*

**B.      The Vehicle's Design.**

The Vehicle was a four-wheel-drive, four-door sedan. *See Thomas Slaba Affidavit, ¶¶1-9, attached as Ex. A; see also demonstrative photograph, attached to Ex. A as Ex. A1.* During the design stage, the Vehicle's model-line was the subject of extensive aerodynamic and airflow design, research and development. *Ex. A, ¶ 27.* Design engineers incorporated rubber seals, plastic coverings, multiple hood latches and sheet metal interlocking to seal the hood area against the infiltration of any kind of debris. *See Richard Keefer Affidavit, ¶¶16-33, attached as Ex. B; see also Exs. B3- B43.* There are no "openings" around the four sides of the hood that would permit the infiltration of the type of debris at issue in this case. *Id; see also Ex. A, ¶ 29.*

A large portion of the Vehicle's underbody, including the engine compartment, was shielded by underbody covers. *Ex. A, ¶¶6-9 and Exs.. A2-A3.* The area of the front axle between the front wheels in the Vehicle was shielded by a portion of the under-engine compartment cover called the stiffening plate. *Id.* The stiffening plate on the 2007 BMW 328xi serves to strengthen the four-wheel-drive vehicle's front axle. *See Thomas Slaba deposition at pgs. 45-47 and Errata Sheet.[1]* Also, as a portion of the overall design of the under-engine compartment cover, the stiffening plate: (1) reduces drag by guiding the airflow underneath the vehicle, playing a significant role in the vehicle's aerodynamic characteristics thereby reducing

---

[1] Mr. Slaba's deposition was initially filed on November 20, 2013 by Jon Phillips in support of Brentlinger Enterprise's Motion for Summary Judgment.  However, Mr. Phillips filed the deposition prior to receiving Mr. Slaba's errata sheet. As such, Mr. Slaba's deposition, with errata sheet attached, is being refiled.

fuel consumption*; (2)* contributes to the thermal management of the engine, allowing the engine to reach operating temperatures quicker, thereby reducing fuel consumption*; (3)* contributes to the thermal management of the catalytic converters, allowing them to reach operating temperatures quicker, thereby reducing vehicle emissions*; (4)* contributes to the thermal management of the engine, allowing it to retain heat during short breaks in operation resulting in the reaching of operating temperatures quicker; which, in turn, allows the vehicle to heat the passenger compartment more rapidly*; (5)* acts as a shield to protect the engine compartment from road fluids and spray, reducing the accumulation of dirt and grime*; and, (6)* acts as a barrier to reduce vehicle noise emissions.  *Id., at pgs. 45-47.*

These numerous functions of the stiffening plate are not secondary to the role it plays stiffening the front axle.  In fact, the sister two-wheel-drive model (the 2007 BMW 328i), being rear-wheel drive did not require the front axle be strengthened and so its design does not include a stiffening plate.  *Id., at pg. 48.*  However, as demonstrated by Exhibits A5 and A6, that portion of the under-engine compartment between the front wheels is not left open; the same area is protected by an extension of the plastic cover which serves all of the same functions outlined above.  *Id., at pg. 48.*

**C.    Post-Fire Inspection**

The parties inspected the Vehicle on May 5, 2010.  During the inspection the Vehicle's stiffening plate was removed.  *See Kevin Keaton's Deposition at pgs. 48-52, attached as Exhibit C.*  Debris was observed and photographed atop this portion of the under-engine compartment cover.  *Id; see also, Ex. B, ¶3 and Exs. B44, B45 and B46.*  It is the debris pictured in those three photographs which Clarke's "theories" attempt to explain.

Clarke speculates that the debris magically drifted into the engine through "openings," eventually settling atop the stiffening plate.  *Clarke Deposition, pgs. 96-97.*  But Clarke could not identify with any certainty any specific "openings" in the hood through which debris could have

accumulated in the Vehicle's engine.  *Id., pgs. 121-122.*   Instead, he broadly posits, without any testing or rigorous scientific analysis, the debris could have come in through a number of openings in the hood and "maybe" through the headlights.  *Id.*  Clarke was necessarily vague because there are no such "openings" around the Vehicle's hood.  *See Ex.B, ¶¶18-33; see also Exs. B4-B43.*

Ignoring the fact that he failed to identify any specific openings in the hood, Clarke further speculates that the Vehicle was defectively designed*. Id., pgs. 114-115.* The alleged defect in the Vehicle's stiffening plate was that it "allowed the debris to get caught."  *Id.*  The problem with Clarke's theory on the design defect is two-fold.  First, Clarke limits the defect only to this Vehicle, and not generally to all 2007 BMW 328xi, ("Not every one.  This one is defective."). *Id., pgs. 114-116.*  Clarke is forced to limit his design defect to this Vehicle because he has never inspected other 2007 BMW 328xi's for defects and has not heard of any other 2007 BMW 328xi's catching on fire. *Id.*

Second, Clarke assumes that because the Vehicle caught on fire there must be a design defect.  In fact, he testified as follows:

- "This one is defective in my investigation because I found the cause of the fire, I found the origin area, and the defect is the fact that the foliage couldn't escape from the area."

- "This one is defective because it allowed the debris to get caught in there and cause a fire."

- "I have not looked at any other 328xis for defects.  I was retained to investigate the fire in this vehicle and what I found was a defect as it sits here today because of the entrapment of vegetation on the hot surface. That's the defect."

*Id.*

III.    **LAW AND ARGUMENT**

Rule 702 of the Federal Rules of Evidence governs the admissibility of expert testimony. The district court has a "gatekeeping role" to screen expert testimony and judges have discretion to determine whether such testimony is admissible, depending on its reliability and

relevance. *Daubert v. Merrell Dow Pharms.*, 509 U.S. 579, 589-97 (1993).

The "gatekeeping role" is a three-prong test: (1) determine whether the witness is an expert on the issue by his knowledge, skill, experience, training, or education; (2) determine whether the testimony is reliable under the *Daubert* factors; and, (3) determine whether the testimony is relevant, i.e., it will assist the trier of fact. *Pride v. BIC Corp.*, 218 F.3d 566, 577-8 (6th Cir. 2000) (affirming exclusion of expert); *Buck v. Ford Motor Co.,* 810 F. Supp. 2d 815, 822**.** (N.D. Ohio 2011)(excluding expert). Plaintiffs bear the burden of proving the expert testimony's admissibility under this test by a preponderance of proof. *Pride*, 218 F.3d 566 at 578. Plaintiffs cannot satisfy its burden.

### A.    Clarke is not qualified by knowledge, skill, experience, training, or education to criticize the Vehicle's design, to provide causation opinions, or to propose an alternative vehicle design.

To qualify as an expert, a witness must first establish his expertise by reference to "knowledge, skill, experience, training, or education." *Fed. R. Evid. 702.* Merely calling oneself an expert is not enough. *Pride*, 218 F.3d 566 at 577. "District courts, in their assessment of the 'reliability' of a proposed expert's testimony, are advised to 'determine, [among other things], whether the expert's training and qualifications relate to the subject matter of his proposed testimony.'*"* *Rose v. Truck Ctrs., Inc.*, 611 F. Supp. 2d 745, 749 (N.D. Ohio 2009) (internal citation omitted). "When making a preliminary finding regarding an expert's qualifications under Fed. R. Evid. 104(a), the court is to examine 'not the qualifications of a witness in the abstract, but whether those qualifications provide a foundation for a witness to answer a specific question.'" *Smelser v. Norfolk Southern Ry. Co.,* 105 F.3d 299, 303 (6th Cir. 1997) (quoting *Berry v. City of Detroit,* 25 F.3d 1342, 1351 (6th Cir. 1994)).

Clarke purportedly completed four years of study at Yarmouth Technical College, which culminated in an "automotive engineering degree." *See CV of Richard Clarke, attached as Ex. D.* However, there is no information that Yarmouth Technical College ever existed, and Clarke

has never produced a diploma, certificate, or any other proof that he attended or graduated from Yarmouth.  *Clarke Deposition, pgs. 59-60.*  He also has offered no evidence that this alleged institution was ever accredited.  *Id., pg. 60.*

In addition, Clarke cannot substantiate his course work at Yarmouth.  *Id., pgs. 67-68.*  In fact, he could not remember anything about his course of study during those four years, other than to vaguely state:

> I did stuff from welding to different versions of welding, machining, lathe work, bridgeport kind of work.  I did all of that kind of stuff.  It was all in the four years that we had to work with.  Designing an engine, having it run and putting it on a Dyno, find out what the horsepower rating is.  That's the stuff that we did.  I don't know how that worked out in courses, but that's some of the stuff we did.

*Id., pgs. 68-70.*

Clarke never studied aerodynamics, calculus, chemistry, physics, linear algebra, differential equations, thermal dynamics, material science, vibrations, or fluid mechanics.  *Id., pgs. 48-53.*  Mechanical engineers in the U.S. would be required to study most, if not all, of these scientific disciplines.  *Ex. B, ¶2.*  Clarke never received a mechanical or design engineering degree from any known accredited college our university and does not hold himself out as a mechanical or design engineer; **or even as an expert in vehicle design, at all**.  *Clarke Deposition, pgs. 8, 53-54, 71-74.*

In order to find the Vehicle's design defective, a jury would need to find, among other things, that the foreseeable risks associated with the design exceeded the benefits associated with the design.  *O.R.C. §2307.75.*  Therefore, the "specific question" posed to Clarke involves critical analysis of the risks and benefits associated with the Vehicle's design.  His education does not provide sufficient foundation for him to engage in such analysis or to answer any "specific question" concerning the Vehicle's design.

Similarly, Clarke's work experience does not qualify him as an expert in vehicle design. Consistent with his education, Clarke worked at a car dealership as a mechanic, eventually

working his way up to service manager. *Clarke Deposition, pgs. 16-20.* Mechanics and service managers do not typically design automobiles or component parts, and Clarke was no exception. *Id., pgs. 16-20.*

After serving as an auto mechanic, Clarke worked for Lotus in a "development engineer" position. *Id., pg. 20.* He claims to have been part of a team that designed mounting hardware to allow the installation of Lotus suspensions on production vehicles. *Id., pgs. 21-27.* Clarke admits that this alleged design work is completely irrelevant to his theories in this case. *Id., pg. 28.*

Clarke next served as "National Field Service Engineer" for Lotus. *Id., pgs. 29-30.* In this position, Clarke managed after sales parts and warranty issues, as well as advertising, movie casts, film sets, magazines, test drives, and development work. *Id., pgs. 30-31.* Clarke characterizes the "development work" as relevant to vehicle design, but what he actually did was collect data regarding vehicles' problems and reported those problems to actual engineers. *Id., pgs. 31-44.*

Courts have faced similar issues and excluded the expert. *See Rose,* 611 F. Supp. 2d at 748-9. *Rose* involved plaintiffs offering a mechanic and truck driver as an expert opining that the steering gear was manufactured defectively, causing the accident. *Id.* at 748. The court, finding that the expert was not a mechanical engineer and demonstrated no greater knowledge of mechanical engineering principles than the average juror, precluded the expert from testifying. *Id.* at 749-751. *See   Sigler v. Am. Honda Motor Co.*, 532 F.3d 469, 478-79 (6th Cir. 2008) (Sixth Circuit affirmed the district court's granting motion in limine that barred plaintiff's expert witness, a mechanic, from testifying about accident reconstruction and potential defects in the vehicle). Like the mechanics in *Rose* and *Sigler,* Clarke's testimony must be excluded.

Even an experienced engineer cannot criticize the design of a product or component without specific expertise as to that product or component. *Rose, 388 F. App'x at 533-35; see*

*also Early v. Toyota Motor Corp.,* 277 F. App'x 581, 585-87 (6th Cir. 2008) (holding that an engineer could not testify about alternative designs and design defects where his training had little relationship to the subject matter); *Newell Rubbermaid, Inc. v. Raymond Corp.,* 2010 U.S. Dist. LEXIS 65564 at *3-4 (N.D. Ohio 2010) (holding expert could not testify about forklift design, despite engineering degree, where expert did not have any training related to forklifts); *Chem. Solvents, Inc. v. Advantage Eng'g, Inc.*, 2011 U.S. Dist. LEXIS 41378 at *14-20 (N.D. Ohio 2011)(holding water treatment expert could not properly criticize the design of a water chiller unit due to lack of specific expertise).

Clarke admits that he does not have sufficient experience to qualify as a vehicle design expert.  *Clarke Deposition. pg. 73.*   He has never played any role in designing the vehicle components at issue here.  *Id., 8,18-29, 32-43, 73* Clarke concedes that he is neither an expert in vehicle design nor aerodynamics and airflow.  *Id., pgs. 69-73, 143.* His training and experience do not provide sufficient foundation for him to engage in critical analysis of the Vehicle's design.

Clarke also holds himself out as a fire investigator.  However, Clarke's experience as a fire investigator (i.e., determining the cause of a fire) is irrelevant here, as the parties agree that the debris in the engine compartment caused the fire.  The issue is what caused the accumulation of debris.  Clarke's experience as a fire investigator is irrelevant to this issue. Plaintiffs should not be permitted to shoehorn in design criticisms by framing them in terms of the "cause" of the fire.  *See Wesgram v. Marley Co.,* 169 F.3d 514, 518 (8th Cir. 1999) ("Although Freeman clearly was qualified as a fire cause and origin expert, there is no question that he was not qualified to offer an opinion that the heater malfunctioned and he should not have been permitted to do so."); *Worthington Cylinder Corp. v. Schrader-Bridgeport Int'l, Inc.*, 2014 U.S. Dist. LEXIS 44610, *7-8 (S.D. Ohio 2014) ("The United States Supreme Court and courts of appeals have made clear that a person, although qualified as an expert in one area of

expertise, may be precluded from offering opinions beyond that area of expertise or that are not founded on a reliable methodology").

### B.    Clarke's Theories Are Not Reliable.

For an opinion to be admissible, it must be reliable under the *Daubert* factors.  *Buck*, 810 F. Supp. 2d at 822.  The *Daubert* factors for reliability include: (1) the testability of the expert's hypotheses; (2) whether the expert's methodology has been subject to peer review; and (3) whether the methodology is generally accepted within the scientific community.  *Pride*, 218 F.3d at 577.  Clarke's theories (i.e., the debris came through "openings" in the hood; the stiffening plate is defective because it "trapped" the debris; the alternative stiffening plate design) have not been tested, scientifically analyzed, or subject to peer review.  They are not generally accepted within the scientific community.  They are not reliable.

Because Clarke is not an expert in aerodynamics or airflow, he has done no testing or study of the Vehicle's aerodynamic or airflow properties to support his theory that the debris accumulated through alleged "openings" around the Vehicle's hood.  *Clarke Deposition, pg. 9*. He cannot even say whether the debris allegedly infiltrated the engine during transit or while the vehicle was at rest.  *Id., pgs. 121-122*.  He is not specific as to what "openings" are allegedly allowing debris accumulation.  *Id., pgs. 95-96*

Clarke also did no independent testing, research, or analysis on his theory that the stiffening plate was the site of the debris accumulation.  *Id., pgs. 95-96.*  Clarke's research was limited to reviewing the NHTSA's databases for any information to support the contention that like BMWs have fire issues.  *Id., pg. 99.*  He found none.  *Id.*  Clarke also did no testing or analysis as to whether all 2007 BMW 328xi's are similarly defective.  *Id., pgs. 115-116.*

Clarke's methodology, instead, was limited to inspecting the debris in the Vehicle and having found some organic debris under the hood of a 2009 BMW 328i that he "inspected" about a week prior to this deposition and under the hoods of his relative's vehicles.  *Id., pgs.*

*113-114; 125-126.*  This "data," to the extent it can be characterized as such, is not sufficient to support the contention that debris infiltrated the Vehicle's engine compartment via "openings" around the hood and was prevented from escaping because of the stiffening plate.

Clarke's simply took no "steps that would show professional rigor in the assessment" of the Vehicle's design.  *Newell, supra.*  He chose not to test or support his theories in any fashion and, as such, they must be excluded.

> **C.     Clarke's Theories Are Irrelevant.**

Under the relevance prong, the "scientific testimony must 'fit' the facts of the case, that is, there must be a connection between the scientific research or test result being offered and the disputed factual issues in the case in which the expert will testify."  *Pride*, 218 F.3d. 578. Clarke's theories ignore the relevant facts and are based on unsupported assumptions.  His theories do not "fit" the facts of this case, and therefore are irrelevant.

Clarke ignores that the design, research and development of the E90 platform (on which the Vehicle was built) included extensive airflow and aerodynamic testing and evaluation.  *Ex. A, ¶¶27-28.*  During this extensive airflow and aerodynamic testing and evaluation, the Defendants found no evidence that the type of debris at issue in this case could infiltrate the engine compartment via "openings around the hood," or in any other fashion.  *Id.*

Clarke further ignores the history of Defendants' automobiles similar to the Vehicle. Between 2004 and 2012, Defendants sold approximately 1.8 million vehicles on this platform. *Ex. A, ¶¶30-31.*  These 1.8 million vehicles were equipped with identical or virtually identical under-engine compartment covers, including the stiffening plate.  *Id.*  The design and structure of the fenders, hood, windshield reservoirs, and hood seals were identical or virtually identical on these 1.8 million vehicles.  *Id.*  This is the only case Defendants are aware of in which a person has claimed "openings around the hood" allowed infiltration and accumulation of debris in the engine causing a fire.  *Id.*  Clarke's "openings" around the hood theory conflicts with the

platform development testing and evaluation and the post-sale anecdotal evidence available (i.e., no fires in the 1.8 million similar BMW's sold).

More importantly, Clarke ignores important facts and data from the parties' inspection of exemplars – two 2007 BMW 328xi's, the exact same model as the Vehicle.  One exemplar had over 100,000 miles, while the other had over 92,000 miles.  *See Jeffrey Lindsey Dep., pgs. 20-21, attached hereto as Ex. E; Ex. B, ¶5.*  Despite both exemplars having substantially more miles than the Vehicle (approx. 20,000 miles accumulated at the time of the fire), no debris had accumulated on the exemplars' under-engine compartment covers. *Clarke Deposition, pgs. 108-114.*

Clarke claims the lack of debris on the covers of the two exemplars is irrelevant because he does not know how they were operated or stored on a daily basis. *Id., pg. 113.*    However, he completely ignores the Vehicle's known usage history.  Jean Patrick testified that she always stored it in a garage at home and work.  *Exhibit F, pgs. 37; 40.*  She had no recollection of ever parking the Vehicle in any area where substantial debris accumulated.  *Id., pg. 42.*  After her retirement, she drove the Vehicle to her frame shop almost every day.  *Id., pgs. 44-45.*  At the frame shop, she parked the Vehicle in a parking lot with no trees around and no debris accumulation.  *Id., pgs. 45-47.*  This usage history single-handedly destroys Clarke's theories*.*

Finally, Clarke chose not to even look at the under-engine compartment cover attached to the 2009 BMW 328i he inspected a week before his deposition.  *Clarke Deposition, pg. 126.* The design and structure of this 2009 vehicle was virtually identical to the Vehicle, and its under-engine compartment cover extended to the same area as the Vehicle's stiffening plate. *See Exs. A; B.*  Plus, the 2009 had more than 75,000 miles accumulated.  Clarke deposition.*, pgs. 122-123.*

The facts and data simply do not support Clarke's theories that:  (1) debris can infiltrate the Vehicle's engine via "openings" around the hood; (2) the stiffening plate is defective

because it does not allow the debris to escape; and (3) his "primitive" alternative design of the stiffening plate is safer and will provide the same benefits as the current design. His theories will not assist the jury in deciding a factual issue, but will merely confuse the jury.  They are irrelevant.

### D.  Clarke's Alleged Safer Alternative Design is Inadmissible.

Clarke proposes to replace the stiffening plate with a frame that takes the same general shape as the plate, but is not a solid surface.  *See Clarke's Report, pgs. 35-37, attached as Ex. G.*  Clarke claims that his design would prevent the accumulation of debris by allowing debris to pass through the engine compartment.  *Clarke Deposition, pg. 152.*  However, this opinion suffers from the same lack of qualifications and lack of professional rigor outlined above.

Clarke concedes that the stiffening plate (as part of the under-engine compartment cover) provides numerous benefits (e.g., helps control noise emissions, reduces drag making it more fuel efficient).  *Id., pgs. 148-156; see also Slaba Dep and Errata Sheet, pgs. 45-47.*  But Clarke's proposed design failed to consider any of these benefits and whether his design would achieve these same benefits.  *Id, pgs. 9; 159-160.*    Instead, he characterized his proposed alternative design as a "very primitive beginning design" that does not consider "all these other things that you need to add into it."  *Id., pgs. 154-155.*  Clarke has undertaken no testing of his alternative design.   Clarke has not tested its strength, structural integrity, aerodynamic properties, or its airflow properties.  *Id., pgs. 79-82.*  True engineers and automobile designers have not reviewed or tested his "primitive" design.

Finally, Clarke developed his theories for purposes of this litigation.   Clarke did not develop his theories independent of this case and then apply them to the facts of this case. Courts have rejected theories and methodologies that are created for purposes of litigation. *See Mike's Train House, Inc. v. Lionel, L.L.C.*, 472 F.3d 398, 408 (6th Cir. 2006) ("That this methodology was created for the purposes of litigation further supports our conclusion that [the

proposed expert's] testimony was not reliable under *Daubert*.").

## IV.   CONCLUSION

As an auto mechanic and vehicle fire investigator, with no design experience and no engineering education or background, Clarke is not qualified to conclude: (1) how the debris accumulated in the Vehicle's engine; (2) that the Vehicle's stiffening plate is allegedly defective; (3) how that purported defect caused the Vehicle to catch on fire; and (4) that an alternative design that he characterized as "primitive" would have prevented the accumulation of the debris in the engine.  Even if this Court were to overlook his lack of qualifications, Clarke's theories are not reliable under the *Daubert* factors and are irrelevant in that they will not help a jury to determine a factual issue.  Clarke should be excluded from testifying in this case.

Respectfully submitted,

/s/ John R. Conley
Lawrence A. Sutter (0042664)
John Conley (0084079)
Sutter O'Connell
3600 Erieview Tower
1301 East 9th Street
Cleveland, Ohio 44114
*Attorney for Defendants,*
*BMW of North America, LLC and*
*Bayerische Motoren Werke AG*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 30th day of May, 2014, Defendants' Motion to Limit the Testimony of Richard A. Clarke was filed electronically.  Notice of this filing will be sent to all parties by operation of the Court's electronic filing system.  Parties may access this filing through the Court's system.

/s/ John R. Conley<br>
Lawrence A. Sutter (0042664)<br>
John Conley (0084079)
