IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

Great Northern Insurance Company, :
as subrogee of Allen L. Patrick :
and Jean A. Patrick, et al :  CASE NO. 2:11-cv-01153
 :
    Plaintiffs :
 :
 : **PLAINTIFFS' OPPOSITION TO**
  v. : **DEFENDANTS' MOTION**
 : **IN LIMINE TO EXCLUDE**
Brentlinger Enterprises d/b/a : **TESTIMONY OF**
Midwestern Auto Group and : **RICHARD A. CLARKE**
Midwestern BMW, et al :
 :
    Defendants :

   The plaintiffs oppose the Defendants' Motion for In Limine in its entirety.  Factual and

legal issues preclude the entry of an order excluding the testimony of plaintiffs' expert as is more

fully set forth in the Memorandum of Law in Support of Plaintiffs' Opposition to Defendants'

Motion In Limine, which is incorporated herein.

Respectfully submitted,

ANDREW P. AVELLANO, LLC     COZEN O'CONNOR
ATTORNEY AT LAW

BY:  /s/ Andrew P. Avellano      BY: /s/ Paul R. Bartolacci
   Andrew P. Avellano, Esquire (0062907)   Paul R. Bartolacci (PHV)
   4181 East Main Street       1900 Market Street
   Columbus, OH  43213       Philadelphia, PA  19103
   412-237-8050         215-665-2001
   E-mail: drewavo@wowway.com    E-mail: pbartolacci@cozen.com

Attorneys for Plaintiffs

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| Great Northern Insurance Company, | : | |
| as subrogee of Allen L. Patrick | : | |
| and Jean A. Patrick, et al | : | CASE NO. 2:11-cv-01153 |
| | : | |
| Plaintiffs | : | **MEMORANDUM** |
| | : | **IN SUPPORT OF** |
| v. | : | **PLAINTIFFS' OPPOSITION TO** |
| | : | **DEFENDANTS' MOTION IN LIMINE** |
| Brentlinger Enterprises d/b/a | : | **TO EXCLUDE TESTIMONY OF** |
| Midwestern Auto Group and | : | **RICHARD A. CLARKE** |
| Midwestern BMW, et al | : | |
| | : | |
| Defendants | : | |

## I.   <u>INTRODUCTION</u>

This lawsuit arises from a fire that occurred on March 16, 2010 in a 2007 BMW 328xi which had been driven less than 25,000 miles at the time of the fire.  The BMW was maintained and serviced by Mrs. Jean Patrick in accordance with BMW standards and requirements.  The BMW was generally kept in a garage at the Patrick home located at 3940 Riverview Drive, in Columbus, Ohio, and was used on a regular basis by Mrs. Patrick.

On the date of the fire, while driving home from her job, Mrs. Patrick noticed what she described as a smoke smell which she compared to leaves burning.  Upon arriving home, she pulled the BMW into the garage and was about to make a call to the dealership that she leased the vehicle from when she saw smoke and fire from the garage.  The fire in the garage spread from the garage into the house, causing damages to the Patrick home and personal property and belongings.

All of the experts and the local investigating fire officials in this case have concluded that the fire originated within the BMW.  This model BMW is designated as the E90 platform by BMW.  Further, the experts all agree that the fire was caused by an accumulation of leaves and

other organic material adjacent to a "stiffener plate" that is installed only on the four-wheel drive BMW 3 Series vehicle, but is not present on the two-wheel drive E90 vehicles.  The leafy organic material that ignited was located directly adjacent to the heated components of the exhaust system and in an area between the stiffener plate and the exhaust system, a space of approximately one to two inches.  (See Figures 32-37 and 45 included in the expert report of plaintiffs' expert SEA,  attached as Exhibit 1)  Extensive testing performed by the plaintiffs' experts determined that exhaust system temperatures generated in this area exceeded 700° F.  This is well in excess of the temperatures required to ignite these materials.  Photos of the Patrick home show it is located in a wooded area surrounded by trees.  (See Figures 1-6 included in the SEA report, Exhibit 1).

The plaintiffs' experts, including Richard Clarke, concluded that the accumulation in the vehicle occurred as a result of openings in the vehicle around the hood area and through NACA ducts located immediately in front of the stiffener plate.  The NACA duct is located less than a foot from the stiffener plate and exhaust system.  (See photographs as Exhibit 2).  Mr. Clarke also testified that debris which could accumulate in the hood area of the engine would directly drop down along side of the engine and onto the stiffener plate.  (See Clarke deposition, Exhibit 3, pages 78-79).  Protruding bolts on the stiffener plate act as a means to capture and catch the debris as it accumulates on the stiffener plate. (See Exhibit 3, page 75).  Further, even the defendants' own comparison and review of other comparable vehicles showed that the design of body protection systems similar to the BMW stiffener plates in those vehicles were much more conducive to permitting any debris that was drawn into the vehicle to "self-clean" from the exhaust system and underbody protection plates.  (See Exhibit 3, pages 169-173).

As noted in his Affidavit attached as Exhibit 4, Mr. Clarke is an expert in Failure Mode Analysis with respect to vehicle fires.  Mr. Clarke worked extensively with the National

Highway Traffic Safety Administration (NHTSA) in order to identify a defect in a Ford Motor Company component that caused a substantial number of fires in Ford vehicles.  The investigation led to a recall by Ford Motor Company of more than 14.9 million Ford vehicles. Mr. Clarke played a pivotal role in identifying the defect in the Ford cruise control deactivation switch which ran continuously even when the vehicle was not in operation.  The switches were prone to failure over time leading to short circuiting and the ignition of flammable material.  Mr. Clarke proposed two alternative designs that could be utilized to prevent fires – removing the switch from the power at all times circuit and installing a fuse in the circuit.  Ford ultimately redesigned the switch using the fused circuit suggested by Mr. Clarke.  In the context of that investigation, Mr. Clarke investigated hundreds of cruise control deactivation switches and worked directly with the NHTSA for several years.  (See Exhibit 4, paragraph 5).

He has been involved in vehicle design of support plates for General Motors and the Lotus Formula One racing team, the preeminent vehicle group associated with aerodynamics and Formula One racing.  He has designed brackets for suspension systems for vehicles.  He has developed two high performance  test vehicles for Bugatti for the United States market.  Mr. Clarke has considerable experience and exposure to aerodynamic issues.  He learned and trained with the Formula One race team to evaluate and consider aerodynamics.  Mr. Clarke was trained in the field of aerodynamics with the Formula 1 Race Team, the leading automotive team in racing aerodynamics.  While working at Lotus Engineering with the Formula One Race Team, he helped develop the Active Suspension System into a production vehicle.  This was specifically intended to improve the handling of the vehicle by keeping the ride height of the vehicle level at all times despite bumps in the road, controlling the ride height according to changes in weight and aerodynamic loading of the vehicle, maximizing the grip of the vehicle under all road conditions and maximizing the aerodynamic efficiency to the underside of the vehicle.  Mr.

Clarke performed the installation and set-up of all of the active components to the chassis and tested the system.  This was essential and critical to control the aerodynamics on both the top surface and the underside of the vehicle. (See Exhibit 4, paragraph 11).   Mr. Clarke has also been involved in drawing designs for components of vehicles that were being developed.  He worked as an apprentice motor vehicle technician at a BMW facility in England while he was in college.  He has a four year degree in automotive engineering from a college in the United Kingdom which is equivalent to a Bachelor of Science degree in the United States.

 Significantly,  Mr. Clarke's opinion is not that the presence of "openings" in the BMW is a defect.  Rather, the defect in the vehicle is that debris was naturally permitted to accumulate in the BMW vehicle directly adjacent to heated surfaces because of the design of the stiffener plate and its location which essentially trapped debris in that area.

The design defect issue here is relatively simple.  The stiffener plate is a solid piece of aluminum attached to the underside of the BMW.  The primary purpose of the stiffening plate is to provide stability and strength on the all-wheel drive BMW E90 vehicles and protect the underside of the engine from damage from the road.  There are no moving parts, no special materials nor any unique means of attachment or interaction between the stiffener plate and any other moving components of the vehicle.  (See Exhibit 4, ¶ 18).  Mr. Clarke's opinion is that BMW should have designed the stiffener plate with openings that allowed for "self-cleaning" of any debris that passed through that area and the dissipation of heat, as opposed to utilizing a solid stiffener plate with very close clearances to heated exhaust systems and attached with bolts that protrude through the vehicle frame, acting as a "catch" for any materials.

Mr. Clarke explained his theories in this case, based upon his background and experience, and using the scientific method, as follows.  He was asked to identify the cause and origin of the fire and evaluate whether the hot surface ignition could be a result of a defect in the vehicle.

Based on his investigation, he concluded that the stiffener plate was the instrument that allowed the combustible material to get too close to the hot surface.  This all-wheel drive vehicle is the only BMW vehicle in the 3 series line that has the stiffener plate.  His opinion was that if the stiffener plate was needed, it could be fabricated and designed with holes and openings added to it in order to permit egress for the debris to fall out.  Based upon that analysis, he developed his alternate design.  It would prevent the fire that happened in this case.  The prototype he developed was fabricated of appropriate metal and was actually attached to the underside of a vehicle and it physically prevents the accumulation of combustibles.  The original stiffener plate could do the same job if BMW added holes or openings in the plate.  (See pages 79 and 80 of Exhibit 3).

Mr. Clarke also explained that the NACA ducts permitted small amounts of organic material to enter the stiffener plate area and the most logical explanation is that other debris came from the engine area dropping down.  If there are openings in the stiffener plate, there would be self-cleaning of the area.  (See page 132 of Exhibit 3).  Mr. Clarke personally observed other E90 platform BMWs where debris had accumulated in the creases around the hood for the vehicle and adjacent to the fenders and windshield.  BMW doesn't dispute this can occur, it simply argues that the organic material such as leaves, twigs, etc. cannot move from that location into the engine compartment and then fall down to the stiffener plate.  However, Mr. Clarke's opinion is based upon turbulence that occurs within the vehicle engine compartment as the car is moving.  (See page 97 of Exhibit 3).  Finally, Mr. Clarke made it clear that he followed an acceptable procedure using a reliable process of elimination and relied on others to eliminate the potential for a rodent to have deposited the combustible materials in this vehicle.  (See page 86 of Exhibit 3).

## II.     LEGAL AND EVIDENTIARY STANDARD

Federal Rule of Evidence 702, as it has evolved from the Supreme Court's decision in Daubert v. Merrell Dow Pharmaceuticals, 509 U.S. 579 (1993), was intended to liberalize the introduction of relevant expert evidence.  Jahn v. Equine Services, PSC, 233 F.3d 382 (6th Cir. 2000).  Determining the reliability of an expert opinion is a flexible inquiry to be undertaken by the trial court and one which necessarily depends on the nature of the opinions and the context in which those opinions are offered.  The factors enumerated in Daubert "neither necessarily nor exclusively applies to all experts or in every case." Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 141 (1999).  If the inquiry at hand does not involve pure "scientific" testimony, but rather technical or other specialized knowledge, the factors set forth in Daubert cannot readily be applied to evaluate the reliability of such proffered testimony.  Surles v. Greyhound Lines, Inc., 474 F.3d 288 (6th Cir. 2007); United States v. Paulsen, 543 F. Supp. 2d 809 (S.D. Ohio 2008).

The trial court has considerable leeway in deciding in any particular case what factors to utilize in determining whether expert testimony is reliable.  Where the reliability of evidence is in dispute, it is more appropriate for the trial court to admit the evidence than to preclude it since cross examination, presentation of contrary evidence and appropriate instructions to the jury are the traditional means to attack what is claimed to be shaky opinion evidence.  Williams v. General Motors Corp., 2007 WL 3232292 (N.D. Ohio, October 30, 2007).  While "extensive academic pedigree and prolific scholarly publication" are persuasive on the issue of qualifications of the expert, the presence or absence of those qualifications is almost always an issue that goes to the weight of the expert's opinions and not the admissibility of the testimony itself.  Benton v. Ford Motor Co., 492 F. Supp. 2d 874 (S.D. Ohio 2007):

> To be sure, the Sixth Circuit agrees that, where the opposing side
> has the opportunity to cross-examine an expert regarding his
> qualifications and where the jury is properly instructed to
> determine for itself the weight and credibility to be given to the

expert's testimony, an argument opposing admissibility of the
testimony on the grounds that it is outside the witness's area of
expertise must fail.  Id. at 877.

Judged against these principles, BMW's motion to exclude the opinions of Mr. Clarke

must be denied since he possesses proper qualifications to express those opinions asserted in this

case, his methodology in arriving at those opinions is reliable and the opinions developed during

the investigation of the fire and discovery during this litigation are relevant.

**III.    MR. CLARKE IS QUALIFIED TO OFFER OPINIONS BASED UPON HIS
KNOWLEDGE, SKILL, EXPERIENCE, TRAINING AND EDUCATION**

BMW begins its attack on Mr. Clarke by questioning his educational background.  BMW

claims that, despite Mr. Clarke's undisputed testimony in his deposition, there is no information

that his education instruction in England currently exists, and he does not have a copy of his

diploma - which was obtained in 1982.  BMW questions why Mr. Clarke could not remember the

specific courses he took back in the late 1970's – early 1980's.  These issues by themselves are

pure and simple "credibility" issues which do not provide the basis to exclude Mr. Clarke's

opinions.  While BMW offers a statement about professional mechanical engineering,  Mr.

Clarke has not claimed that he graduated with a mechanical engineering degree.  He achieved a

four year degree (similar to a B.S. in the United States) from England's Yarmouth Technical

College in Automotive Engineering. (See Exhibit 3, page 16).  As set forth in-depth in the

attached Affidavit from Mr. Clarke, his background and experience are more than ample to allow

him to provide opinions in this case with respect to the cause of the fire, the ability of

combustible organic materials to be captured or trapped in the area of the stiffener plate and the

exhaust system and a feasible alternative design that would have prevented this accumulation

and therefore prevented the fire.

The stiffener plate that is the subject of Mr. Clarke's opinions in this matter is not a

complex component of the E90 BMW vehicle.  It is a solid aluminum piece that is mechanically

attached to the underside of the vehicle with a series of bolts.  These bolts protrude through the frame and act as barriers to debris flowing past and over the stiffener plate.  The stiffener plate has no moving parts nor is it made of any specialized metal.  There is no dispute that there are openings in the underside of the vehicle through what are called "NACA" ducts.  There is also a direct path for debris that is able to gather in the engine compartment to pass alongside the engine and settle on the stiffener plate.  (See Exhibit 4 at paragraphs 31 and 32).

Mr. Clarke has been involved in the automotive industry since 1982.  He has investigated more than 100 vehicle fires in his career.  His background involves the design of components for General Motors and the Lotus Formula 1 racing team.  During his career as an automotive fire and component design expert he has evaluated whether conditions in a vehicle constituted a faulty or defective condition that caused a fire or injury and whether that condition could be feasibly remedied and corrected in order to prevent an accident.  As noted previously, Mr. Clarke has performed work with the NHTSA in order to identify a defect in the Ford cruise control deactivation switch component that led to fires in Ford vehicles and ultimately the recall of 14.9 million Ford vehicles.  Mr. Clarke proposed alternative designs, one of which was utilized by Ford in its redesign of the defective component.

BMW suggests that because Mr. Clarke has no formal training in aerodynamics and has never designed a "stiffener plate" he should be precluded from offering opinions in this case.  First, this is incorrect with respect to aerodynamic training, as noted in Mr. Clarke's affidavit.  Further, similar arguments have regularly been rejected by courts in the Sixth Circuit.  In Benton v. Ford Motor Co., 492 F. Supp. 2d 874, the court denied a motion to preclude the plaintiff's expert who offered opinions with respect to an alleged defective design involving a Ford Explorer rollover accident.  The expert in that case was an electrical engineer with no experience in the automotive industry and who had not reviewed the design specifications for the vehicle in

question or the vehicle itself.  The court noted that the witness had investigated other rollover accidents and this was sufficient to allow his testimony.  The court concluded that the arguments of Ford went to the weight and not the admissibility of the expert's opinions.  Similarly, Mr. Clarke's background and experience is focused on evaluating automotive fires and considering whether those fires were caused by any defective components or conditions in the vehicle itself. He is certainly qualified, based upon his background and experience, to offer those opinions and propose alternative opinions that would have prevented fires.

A similar result was reached in Williams v. General Motors Corp., 2007 WL 3232292 (N.D. Ohio October 30, 2007) where General Motors asserted that plaintiff's expert witness had no expertise in fuel system design for trucks, the subject of his proposed testimony.  The court held that the expert was qualified by experience in various areas of the automotive industry and mechanics and by virtue of his work as a consultant for automobile manufacturers.  In Floyd v. Pride Mobility Products Corp., 2007 WL 4404049 (S.D. Ohio, December 12, 2007), the defendant argued that the experts offered by the plaintiffs in a mobility scooter injury case should be precluded from testifying because they had not been involved in the design of scooters nor had any involvement in the scooter industry.  The court noted that the opinions of the experts in Floyd were not based on estimates or assumptions, but rather were generated by facts and inspections of the accident scene and evidence.  Likewise, Mr. Clarke's opinions are based upon his investigation of the subject vehicle and exemplars and the pretrial discovery of witnesses and documents.  In United States v. Paulsen, 543 F. Supp. 2d 809 (S.D. Ohio 2008), this court noted that "experience based" testimony satisfies the requirements set forth in Daubert.  Like the defendants moving to exclude in Floyd, supra. and Paulsen, supra. BMW seeks to impose unfairly onerous conditions on the plaintiffs in this case with respect to Mr. Clarke, using an application of Daubert that is too rigid.

Mr. Clarke's testimony will assist the trier of fact. His testimony is not unique scientific theory, but is intended to present the jury with specialized knowledge and information relating to the cause of the fire and conditions within the BMW that created a fire risk. To the extent that BMW suggests there are weaknesses in Mr. Clarke's opinions, those issues go to the jury. McLean v. 988011 Ontario, Ltd., 224 F.3d 797 (6th Cir. 2000).

The cases relied upon by the BMW defendants in support of their arguments are distinguishable. For example, in Sigler v. American Honda Motor Co., 532 F. 3d 469 6th Cir. 2008) the expert was precluded from offering testimony because he never examined the physical evidence, in contradiction to his typical methodology. Further, he was offering testimony outside of his stated area of expertise. The issue in that case was also much more complex than the issues here and included the reasons why an airbag failed to deploy in an automobile accident. Likewise, in Rose v. Truck Centers, Inc., 611 F. Supp. 2d 745 (N.D. Ohio 2009), the plaintiffs expert offered opinions that were determined to be improper assumptions on a steering gear mechanism which he examined six months after the accident. He assumed the condition he saw existed at the time of the accident. The expert's entire argument was based upon a series of bolts not being properly tightened when the steering gear mechanism was manufactured. He failed to consider that photographs taken of the steering gear showed that the bolts were loosened and manipulated after the accident but before his examination. Furthermore, his knowledge with respect to mechanical engineering principles was not any greater than that of an average juror in the view of the court.

Buck v. Ford Motor Co., 810 F. Supp. 2nd 815 (W.D. Ohio 2011) involved a question as to whether or not a Ford Expedition had suddenly accelerated because of a design defect that caused the vehicle to be susceptible to unintended throttle opening because of the impact of electromagnetic interference on the electronic throttle control system. Clearly the design defect

issue in that case was more complex than the relatively simple issue in this case.  However, the court noted that rejection of expert testimony is typically the exception rather than the rule. Early v. Toyota Motor Corp., 277 Fed. App. 581 (6th Cir. 2008) included the selection of particular materials for a seal surrounding a steering column and whether conditions that the vehicle was exposed to, caused the seal to deteriorate.  The expert made no investigation of the condition of the seal before the incident and failed to consider an alteration of the seal because the vehicle had been involved in an earlier accident.

BMW does not argue that Mr. Clarke is not qualified to offer opinions with respect to the causation issue in this case.  Mr. Clarke's opinions that organic debris was captured in the area between the stiffener plate and the exhaust system, causing the fire to spread within the vehicle and to the home of Mr. and Mrs. Patrick is unchallenged.  BMW does not even contest that the stiffener plate did act as a "trap" for the combustible material.  Its dispute is based upon the question of how the debris accumulated in that area.

This is a classic jury question that must be decided by the fact finder considering all the evidence in this case, including that evidence to be presented by both parties with respect to the "rodent nest building" theory advanced by BMW.

## IV.     MR. CLARKE UTILIZED A RELIABLE METHODOLOGY IN REACHING HIS OPINIONS

As noted in his Affidavit, Mr. Clarke utilized the "scientific method" to reach his opinions in this case.  The scientific method is an accepted process for evaluating a particular forensic issue.  The following facts are established in the record and provide a proper foundation for Mr. Clarke to offer his opinions in this case, to which BMW objects.  First, there was a fire in the BMW vehicle.  Second, the post-fire examination found organic debris wedged in the area of the stiffener plate and next to the exhaust system for the vehicle.  Third, the investigators for all parties agreed that this organic debris was the fuel source for the fire.  Fourth, testing performed

11

by plaintiffs' experts confirmed that temperatures generated by the exhaust system were capable of igniting this organic material. Fifth, the stiffener plate is a solid piece of aluminum with protruding bolts that has the capability of trapping organic material in the area where the fire occurred. Sixth, there are openings in the vehicle allowing debris to enter.

The evaluation of an expert witness under Daubert and Rule 702 requires only that the proposed testimony be derived from inferences that are based upon the "scientific method" and that those inferences be supported from the facts of a case. See Nemir v. Mitsubishi Motor Sales of America, Inc., 6 Fed. Appx. 266 (6th Cir. 2001) and Jahn v. Equine Services, PSC, 233 F. 3d 382 (6th Cir. 2000).

BMW focuses its argument in this motion and in its motion for summary judgment on the issue of how the combustible materials accumulated next to the stiffener plate and heated exhaust system. There are two competing theories. The plaintiffs allege that materials accumulated through natural and designed openings in the vehicle. BMW alleges that the materials were deposited next to the heated surfaces by a rodent building a nest. It is not the court's role as a gatekeeper to determine which conclusion is correct.

> But comparing two pieces of evidence and determining which is more credible should be left for the finder of fact and should not be considered when ruling on Rule 702 on admissibility.

Jahn, 232 F. 3d at 391.

Mr. Clarke's methodology was not limited to simply finding debris and concluding that a defect existed. He considered the designed openings in the vehicle, including the NACA ducts and areas surrounding the engine compartment. He evaluated the fire vehicle and exemplars to determine whether debris in the engine compartment could migrate to the stiffener plate. He noted that the NACA ducts were directly in front of the stiffener plate and thus allowing direct access to the stiffener plate. He considered that the vehicle was driven on a regular basis and

understood that Mr. and Mrs. Patrick lived in a wooded area.  BMW essentially argues that Mr. Clarke is "wrong"; but that is not the test nor is it the Court's function to make that determination in the context of this Motion.

Mr. Clarke is entitled to evaluate these two different theories or hypotheses pursuant to the scientific method and, based upon material testing and evaluation, reach conclusions as to which is more probable.  (See Exhibit 4, ¶ 27, 28 and 30).  Mr. Clarke's opinions should not be viewed in a vacuum.  The opinions of plaintiffs' fire cause and origin experts at SEA and plaintiffs' rebuttal "rodent" expert, Dr. Michael Steele must be considered.  Those witnesses also offered opinions with respect to the migration of material next to the stiffener plate and whether a rodent could have intentionally deposited those materials in the area of origin prior to the fire. Dr. Steele provided reports indicating that in his opinion it was highly unlikely that a rodent would have built a nest in the area of the exhaust system.  (See reports of Dr. Steele dated January 2, 2014 and March 18, 2014 attached hereto as Exhibit "5").

Thus, when viewed along with all of the opinion testimony in this case, Mr. Clarke has a reasonable and reliable basis to offer an opinion that the debris accumulated because of openings in the vehicle.  There is nothing inherently unreliable with respect to a process of elimination methodology if it is scientifically valid.  See Carmichael v. Samyang Tires, Inc., 923 F. Supp. 1514, 1520 (S.D. Ala. 1996), reversed 131 F. 3d 1433 (11th Cir., 1997), reversed Kumho Tire Co. Ltd. v. Carmichael, 526 U.S. 137 (1999).  Further, an expert's testimony may be formulated by the use of facts, data and conclusions of other experts, even if that other data is not admissible in evidence.  Ohio Environmental Development Ltd. v. Envirotest Systems Corp., 478 F. Supp. 2d 963 (N.D. Ohio 2007).  Mr. Clarke testified that he relied on the opinions of others to eliminate the rodent nest building theory of BMW (See Exhibit 3, page 86 and Exhibit 4 at paragraph 30).

BMW next argues that Mr. Clarke must be precluded from testifying because he has not performed physical testing of his theory.  But, BMW has not offered any support in its motion that the opinions of Mr. Clarke can be "tested".  Even if testing is plausible, Courts in this Circuit have denied motions to exclude based on <u>Daubert</u> and Rule 702 where a party alleges that the proposed expert testimony and conclusions have not been tested.  <u>See</u>, <u>e.g.</u>, <u>Fisher v. Ford Motor Co.</u>, 13 F. Supp. 2d 631 (N.D. Ohio 1998), (where the court dismissed Ford's argument that a plaintiff's expert should be precluded because he did not personally test his proposed alternative designs, did not review Ford's design specifications nor did he perform any testing on the air bag in the plaintiff's car; <u>Williams v. General Motors Corp.</u>, 2007 WL 3232292 (N.D. Ohio October 30, 2007),  (the expert's failure to perform his own independent tests or studies of his theory went to the weight of his testimony not its admissibility);  <u>Clay v. Ford Motor Co.</u>, 215 F. 3d 663 (6th Cir. 2000),  (the expert's failure to test his theories that a Ford Bronco was subject to a rollover accident based upon a theory that the vehicle was capable of over-steering and jacking went to the weight of his testimony regarding the defects but not its admissibility); <u>Benton v. Ford Motor Co.</u>, 492 F. Supp. 2d 874 (S.D. Ohio 2007),  (whether a methodology or theory can be tested and whether an expert's failure to test should have an impact on his opinions is a concern best left for the jury in weighing the evidence); and <u>Clark v. Chrysler Corp.</u>, 310 F.3d 461 (6th Cir. 2002),  (the fact that the experts in a door latch defect case did not perform any testing went to the weight of the expert testimony, not its admissibility.)

Plaintiffs acknowledge that they bear the burden of proof at trial.  The totality of the evidence that the plaintiffs will present at trial presents factual issues for a jury to decide.  It is not for the court to decide in the context of this motion to exclude whether Mr. Clarke's opinions with respect to the cause of the fire are correct.  To reach that conclusion, as a matter of law the court would also be required to rule as a matter of law that the opinions of Dr. Steele relating to

14

the ability of a rodent to build a nest next to a heated component in a car that is operated regularly must also be rejected.  Given the choices that the jury will have to make in this matter, it is understandable why BMW does not want the jury to decide whether debris accumulated in the BMW vehicle through openings in the car, or was placed in the car as a nest by a rodent despite the fact that the car was operated daily and the debris that caught fire was located in a 1" to 2" confined space and an area where temperatures regularly exceeded 700° F.

## V.    MR. CLARKE'S OPINIONS ARE RELEVANT AND "FIT" THE FACTS OF THIS CASE.

The facts of this case upon which Mr. Clarke rely are undisputed.  BMW claims Mr. Clarke has not considered BMW's self-serving theory.  Mr. Clarke has not ignored any alleged evaluation of his theory conducted by BMW during its development of the E90 vehicle.  Mr. Clarke noted Mr. Slaba testified that BMW did no evaluation or testing with respect to the issue of whether debris could accumulate next to the stiffener plate under normal operation of the vehicle.  (See Exhibit 4, ¶ 34).  (The plaintiffs incorporate their Motion to Strike Mr. Slaba's Affidavit in this Response).  Further, BMW tries to misdirect the court by suggesting there are 1.8 million vehicles that were sold by BMW with a plate that has the same properties (materials and functional) as the stiffener plate in the fire vehicle.  To the contrary, as admitted by Mr. Slaba in both his deposition and Affidavit, it is only the all-wheel drive E90 platform that uses the metal stiffener plate.  There were 220,000 of these vehicles produced.  (See deposition of Thomas Slaba, Exhibit 6, page 25).  Mr. Slaba, in his short two year career in his current position at BMW, has become aware of 20 to 30 fires involving E90 platform vehicles.  Many of those fires are undetermined in terms of a cause.  He could not eliminate the fact that other fires occurred that were not reported to BMW, nor could he eliminate the possibility that fires occurred where evidence of the cause of the fire was completely destroyed.  (See Exhibit 6, at pages 25-30).

Observations with respect to the exemplar vehicles allegedly without debris next to the stiffener plate is not a basis to exclude Mr. Clarke's testimony.  There is no history for those vehicle.  The exemplars acquired by the plaintiffs and BMW were from used car dealers who likely completely cleaned the vehicle prior to the resale, including power washing the engine compartments and underside of the vehicle.  These arguments by BMW may be useful in cross-examination of Mr. Clarke, but do not form the basis for a preclusion of his testimony based upon any factor set forth in Rule 702 or the Daubert line of cases.

Further, BMW's suggestion that Mr. Clarke testified that it was only this specific 2007 BMW leased by Mrs. Patrick that was defective is not correct.  In fact, Mr. Clarke testified that this particular design with respect to the all-wheel drive E90 vehicle designated as the BMW 328xi is defective.  Each vehicle has the same defective plate on it because they all present the potential for fires.  He called the risk of fire "substantial".  (See, Exhibit 3, pages 134 and 135).  Mr. Clarke specifically addressed questions with respect to the risk/benefit test at his deposition.  In his opinion, the benefits associated with the stiffener plate did not outweigh the risk of fire.  Even assuming this was the only reported fire under these conditions, Mr. Clarke was of the opinion that the risks outweighed the benefits.  As noted by Mr. Clarke, this was a "luck scenario" for the Patricks.  No personal injury or burn damage occurred to Mrs. Patrick despite the fact that she was operating the car immediately before the fire.  According to Mr. Clarke, if you have a risk of fire in a production vehicle because a component hot surface has the potential to ignite materials, that outweighs any benefit because "you don't want fires in vehicles".  (See, Exhibit 3, pages 159 through 163).

Mr. Clarke described his role in his deposition as a fire investigator and FMEA analyst.  He views his training and years of working in engineering and development to involve determining whether a particular event if foreseeable, whether the event could have been

prevented from happening and whether there is a fix for the problem. He generally described the "fix" in this instance as a modification of the existing plate by putting larger openings in it, by using shorter bolts. (See Exhibit 3, page 75).

## VI. THE ISSUE OF WHETHER MR. CLARKE'S ALTERNATIVE DESIGNS ARE FEASIBLE ARE QUESTIONS FOR THE JURY.

The Plaintiffs are not advocating the complete elimination of a stiffener plate. In fact, the Plaintiffs alternative design accomplishes the primary purposes of the stiffener plate which is to strengthen the front axle and promote better handling of the vehicle. It also provides protection from underside damage to the vehicle. Mr. Clarke's alternative design included his own development of a model that could be used instead of the current stiffener plate. Further, Mr. Clarke testified that one potential alternative design would be to add openings into the current stiffener plate – which has actually been done by BMW in the later F-30 platform now used for its all-wheel drive vehicles. (See Exhibit 3, page 177—181). Photographs of the new BMW stiffener plate used on its current F30 platform of all wheel drive vehicles are attached as Exhibit 7.

The remaining benefits of a completely closed stiffener plate are minimal. As noted below, BMW's own expert was unable to offer any opinions with respect to how Mr. Clarke's alternative design would impact, if at all, the thermal management and noise levels in the vehicle passenger compartment. It is submitted that any product manufacturer or designer in a defect case could devise arguments as to why an alternative design proposed by a plaintiff is not feasible, and that is precisely what BMW has done here.

BMW seizes upon a single word in Mr. Clarke's deposition where he describes the presentation of his alternative design as "primitive.". A fair reading of the entirety of his deposition establishes reliable opinions that cannot be rejected as a matter of law. Defendants' own expert concedes that the alternative design serves the primary functions of the stiffener

plate.  A stiffener plate with openings in it that allow materials that potentially accumulate in the area of the exhaust system to pass over the stiffener plate is both technically feasible and practical.  The new design utilized by BMW has two openings in the stiffener plate.  Designs of other vehicles utilize stiffener plates and underbody covers that are much more open and which promote "self-cleaning" of any debris that can potentially accumulate next to a heat source.  Mr. Clarke testified that the risks associated with the stiffener plate are foreseeable and BMW could have prevented the fire risk by using shorter bolts in the stiffener plate and created openings in the stiffener plate.  (See Exhibit 3, p. 75).

Richard Keefer (BMW's own expert) acknowledged that the new stiffener plate has two openings  and that the NACA ducts directly in front of the stiffener plate in the old design have now been eliminated.  (See Exhibit 8, p. 57).  He acknowledges that Mr. Clarke's alternative design satisfies the strength, ride improvement, handling and performance characteristics of the stiffener plate.  He acknowledges that the noise suppression and heat control are minimal factors. (See Exhibit 8, p. 67).  He acknowledges that road splash could travel to the underside of the vehicle in both designs – Mr. Clarke's and the actual BMW design.  (See Exhibit 8, p. 71).  He can't even say whether the impact on drag reduction and fuel economy would be anything other than minimal.  (See Exhibit 8, p. 74).  His opinion is that fuel economy impact would be relatively small.  (See Exhibit 8, p. 76).  He cannot quantify any reduced emissions with Mr. Clarke's alternative design, nor can he offer any quantitative evaluation of any cabin temperature.  (See Exhibit 8, p. 77).

As noted in Mr. Clarke's affidavit, the stiffener plate is not a complex, unique component.  There is no need to test it in order to establish that an alternative design would prevent entrapment of combustible materials.  (See Exhibit 4, paragraph 40). The presence of

openings will preclude a substantial accumulation of combustible materials above the stiffener plate and next to the exhaust system.

## VII.  **CONCLUSION**

For the reasons stated above, the Defendant's Motion to Exclude Mr. Clarke should be denied.  BMW's Motion repeatedly denigrates Mr. Clarke's qualifications,  but lacks substantive support to preclude Mr. Clarke from testifying.  The standards that BMW suggests is necessary for Mr. Clarke to offer his opinions are unfairly onerous and too rigid.  Mr. Clarke, and plaintiffs' other expert witnesses, will present testimony at trial to support the totality of plaintiffs' theory of how this fire originated and whether the fire was related to a defect in the vehicle.  BMW has not challenged the opinions of any of the plaintiffs' other experts.

Mr. Clarke's opinions are reliable and fit the facts of this case.  Contrary to BMW's simplification of his experience and background, Mr. Clarke is not merely an "auto mechanic" or a "vehicle fire investigator".  His background and experience in the automotive industry more than qualifies him to offer opinions in this case.  The issues raised by BMW in this motion are better left for cross-examination at which time the jury can assess the credibility and reliability of Mr. Clarke's opinions and conclusions.

Respectfully submitted,

ANDREW P. AVELLANO, LLC
ATTORNEY AT LAW
BY:  /s/ Andrew P. Avellano
        Andrew P. Avellano, Esquire (0062907)
        4181 East Main Street
        Columbus, OH  43213
        412-237-8050
        E-mail: drewavo@wowway.com

        AND

COZEN O'CONNOR
BY:  /s/ Paul R. Bartolacci
Paul R. Bartolacci (Admitted Pro Hac Vice)
1900 Market Street
Philadelphia, PA  19103
Phone: 215-665-2001
E-mail: pbartolacci@cozen.com
Attorneys for Plaintiffs

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| Great Northern Insurance Company, | : | |
| as subrogee of Allen L. Patrick | : | |
| and Jean A. Patrick, et al | : | CASE NO. 2:11-cv-01153 |
| | : | |
| Plaintiffs | : | |
| | : | |
| v. | : | |
| | : | |
| Brentlinger Enterprises d/b/a | : | |
| Midwestern Auto Group and | : | |
| Midwestern BMW, et al | : | |
| | : | |
| Defendants | : | |
| | : | |

## **CERTIFICATE OF SERVICE**

I hereby certify that this document filed through the ECF system will be sent electronically to the

registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies

will be sent to those indicated as non-registered participants on this  3rd day of July, 2014.

/s/*Paul R. Bartolacci*
Paul R. Bartolacci

LEGAL\19455334\1