**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **GREAT NORTHERN INSURANCE** | : | |
| **COMPANY,** *et al.*, | : | |
| | : | |
| **Plaintiffs,** | : | **Case No. 2:11-CV-1153** |
| | : | |
| **v.** | : | **JUDGE ALGENON L. MARBLEY** |
| | : | |
| **BMW OF NORTH AMERICA LLC,** | : | **Magistrate Judge Kemp** |
| *et al.*, | : | |
| **Defendants.** | : | |

## OPINION & ORDER

This matter is before the Court on Defendants', BMW of North America LLC ("BMW NA") and Bayerische Motoren Werke AG ("BMW AG") (collectively "Defendants"), Motion for Summary Judgment as to Plaintiffs', Great Northern Insurance Company and Pacific Indemnity Insurance (collectively "Plaintiffs"), claims for: (1) breach of implied warranty against both Defendants (Count IV); (2) product liability under the Ohio Product Liability Act ("OPLA") against manufacturer, BMW AG (Count III); and, (3) product liability under OPLA against supplier, BMW NA (Count II).[1] (Doc. 78). Defendants incorporate their Motion in Limine to Exclude the Testimony of Richard A. Clarke into this Motion. (Doc. 77). Finally, Plaintiffs incorporate their Motion to Strike Affidavits of Thomas Slaba and Richard Keefer submitted by Defendants in support of their Motion for Summary Judgment. (Doc. 83).

---

[1] Plaintiffs' First Claim in their Complaint is a negligence claim against only Defendant Brentlinger Enterprises, and not a claim against Defendants bringing this Motion for Summary Judgment.

# I. BACKGROUND

## A. FACTUAL BACKGROUND

### 1. Vehicle use and fire

On May 30, 2007, Jean Patrick leased a new BMW 328xi (the "vehicle"). BMW AG designed and manufactured the vehicle. BMW NA played no role in the design or manufacture of the vehicle, but merely distributed the vehicle.

Ms. Patrick drove the vehicle for three years without any problems. She maintained the vehicle in accordance with BMW standards, generally kept the vehicle in the garage, never stored the vehicle in a place where substantial debris could accumulate, and drove the vehicle regularly. On March 16, 2010, Ms. Patrick parked the vehicle in the garage attached to her home, which is in a wooded area, and noticed smoke emanating from the vehicle's hood. A few minutes later, a fire that started in the vehicle spread to the Patrick's residence and belongings. As a result of the fire, the Patricks lost their car, their home was uninhabitable, and they incurred extra expenses associated with moving and living in an alternative rental property while repairs were being made to their home. Plaintiffs reimbursed the Patricks under their automobile and homeowners' insurance policy for the damage and costs arising from the vehicle fire ($1,329,999.90 for the residence damage and associated costs of repair and lodging, and $30,791.39 for the BMW). Plaintiffs then filed this subrogation lawsuit against Defendants.

All of the experts and the local investigating fire officials in this case have concluded that the fire originated within the BMW. Further, all experts agree that the fire was caused by an accumulation of leaves and other organic material in an area of approximately one to two inches between the stiffener plate and the heated components of the exhaust system. The stiffener plate is a solid piece of aluminum connected to the underside of the vehicle attached with six bolts and

2

located in the center of the front axle. Its purpose is to provide stability and strength on the all-wheel drive BMW E90 vehicles, and protect the underside of the engine from damage. The stiffener plate is installed only on the four-wheel drive BMW E90 vehicles, but is not present on the two-wheel drive E90 vehicles. What parties' experts contest is how the debris accumulated in the location in the engine compartment where it ignited, and whether there is any design defect in the vehicle.

## 2.  **Plaintiffs' theory**

On March 17, 2010, Plaintiffs retained Kevin Keaton of S-E-A Ltd. ("SEA") to investigate the origins and causes of the fire. The SEA expert concluded that the fire originated in the engine compartment of the vehicle; that it was a result of the accumulation of combustible material (foliage) on an area of a heat shield or cross member positioned under the exhaust piping on the right side of the engine compartment; that the temperature measurements on an exemplar 2007 BMW 328xi exhaust system resulted in temperatures of about 600°F, which is greater than the minimum ignition temperature of 554°F mentioned in the National Institute of Standards and Technology; the competent ignition scenario was a hot surface ignition of the foliage by the vehicle's exhaust components; the vehicle was operated daily and positioned within the garage when not in use; the foliage was examined and found to contain no rodent activity; and all other competent ignition sources were eliminated as being causal to the fire. (Doc. 81-1).

Keaton's report states that upon examining an exemplar vehicle, he concluded that "the heat shield positioned in this area was found to have flat areas…which would allow for debris to accumulate from openings in the area of the adjacent wheel well…." *Id*. at 26. At his deposition, Keaton states that "debris entered the vehicle through the openings in the vehicle—through the

3

bottom openings of the vehicle and possibly through the wheel well openings in the vehicle."

(Keaton Deposition, Doc. 76 at 80-81).

Plaintiffs also offer expert testimony of Richard Clarke, a consulting engineer who provides technical expertise on engineering investigations of failed automobile components. In his September 26, 2013 report, Clarke offered the following opinions based on his review of both the vehicle and an exemplar vehicle of the same make and model, the file information, photographs of the vehicles at the loss site, and the analysis of the fire patterns:

- The fire was due to the ingress of leafs and pine needles being trapped in the area of the catalytic converters and the exhaust down pipes.
- This entrapment of combustible materials was due to the placement and design of the Lower Stiffening Plate.
- Material of this nature which is dry becomes very combustible when in close proximity to the catalytic converter and exhaust down pipes which is at normal operating temperature after the car has been driven for ten to fifteen minutes. Once combustion has started, combustible material in the immediate area would then be consumed.
- The lower stiffening plate is defective as it allows entrapment of combustible materials to build up in close proximity to the catalytic converter and exhaust down pipes. This defect was the cause of the fire.
- A safer alternative designed Lower Stiffening Frame with openings for egress and ingress and with edges that would avoid the accumulation of any combustibles and would have prevented such an entrapment of the combustible materials, such as the prototype Clarke designed and manufactured.
- The benefits of his alternative design outweigh fire risks inherent in the design, especially since a reasonable alternative design is feasible.

(Report of Richard Clarke, Doc.77-7).

In terms of his theory of how debris entered the area where the fire began, Clarke testified in his deposition that debris could have entered via a direct and unobstructed air path through the NACA duct, which is located less than a foot from the stiffener plate and exhaust system. According to Clarke, the purpose of the NACA duct is to introduce outside air to cool the engine and exhaust system. Mr. Clarke also testified that debris that naturally accumulates on the hood could directly drop down along side of the engine and onto the stiffener plate. (Doc. 81-3). Mr. Clarke further opined that his review of other comparable vehicles, including the newer

4

F30 all-wheel drive BMW, showed that the design of body protection systems similar to the vehicle's stiffener plate had holes in them, and therefore were much more conducive to permitting any debris that was drawn onto the stiffener plate to "self-clean."

### 3.  **Defendants' Theory**

Defendants state that it was impossible for debris to collect on the stiffener plate in the manner Clarke opines because the hood of the vehicle is completely sealed. Instead, Defendants argue that debris collected on the stiffener plate area due to a fox squirrel nesting in the vehicle around the time the fire occurred. This theory originates from the final inspection of the vehicle on November 1, 2013. During the inspection, SEA personnel lifted the vehicle with a forklift to allow under-vehicle inspection. The forklift fractured an under-vehicle body cover that had not been removed previously. When the cover fractured, the remains of a rodent fell out, which consisted of some hair and bones.

Dr. Robert Gates, Defendants' expert, examined the material collected at a joint May 5, 2010 inspection and compared it with the rodent remains discovered at the November 1, 2013 inspection. Dr. Gates discovered a bi-colored, mammal hair in the debris collected at the May 5, 2010 inspection. He concluded that the hair and bones collected at the November 1, 2013 inspection appeared to be the partial remains of a fox squirrel and that the hair was bi-colored, like the hair found in the materials from the May 5, 2010 inspection. He concluded that SEA's conclusion that rodent activity was not a factor in the case of debris accumulation was incorrect, and that the materials ignited by the exhaust components of the vehicle were likely deposited adjacent to the exhaust system by the fox squirrel whose remains were found on November 1, 2013. (Report of Dr. Robert Gates, Doc. 81-4).

#### 4.  **Plaintiff's Rebuttal**

In rebuttal of Defendants' rodent theory, Plaintiffs offer the report of Dr. Michael Steele, an expert on the ecology and behavior of tree squirrels, to maintain their position that the evidence examined by SEA and the BMW experts in 2010 did not show any nesting created by rodents. (Report of Michael Steele, Doc. 81-5). Steele's report concludes that it is more likely than not that the fox squirrel whose remains were found on November 1, 2013 inhabited the vehicle after it was stored, outside, at the SEA facility. The report states specifically that: it was unlikely for a squirrel to build a nest in close proximity to a heated exhaust system capable of generating temperatures in the 600°F to 700°F range; the confined area above the stiffener plate where the fire began is inadequate space for a nesting fox squirrel; the debris found above the stiffener plate contained material that is not typical of the nest of a fox squirrel; it is highly unlikely that a fox squirrel would enter a garage and colonize a vehicle that is in regular use (squirrels nest at much higher points, and in more stable structures); it is unlikely that a fox squirrel would remain in a vehicle after the fire began; it is more likely that a fox squirrel would inhabit a vehicle stored outside that is not operational; and, it is more likely than not that the presence of maggots found in the partial remains are indicative of a squirrel which had not been dead since March, 2010.

#### 5.  **Richard Clarke's Qualifications**

Clarke has a four-year Automotive Engineering Degree from Yarmouth Technical College in London, England. He is not a licensed engineer. Clark states that he is failure mode and maintenance expert in the automotive field. (Clarke Deposition, Doc. 70 at 8). As a failure more analyst he investigates fire origin and causation, assesses foreseeability of component failure, and recommends potential fixes for identified problems. *Id*.

Clarke does not hold himself out as a design engineer. *Id.* at 8-9, 73. He has never designed under engine covers like the under engine cover that is on the BMW 328xi. *Id.* He states in his deposition and his affidavit, however, that he has been involved in the design of support plates and other frame materials for General Motors and the Lotus Racing team. (*Id.* at 10, Doc. 81-6 at ¶ 8).

In terms of his work history, from 1978-1982, Clark worked as an apprentice motor vehicle technician for BMW. From 1982-1985, he worked as a vehicle technician for Mercedes Benz and Lotus. *Id.* at 16-20. From 1985-1987 Clarke worked as a development engineer for Lotus, where he worked on a team developing hydraulic active suspension components for various manufacturers. *Id.* at 21-28. Specifically, he helped design support brackets used to install the suspension system on vehicles. *Id.* at 10, 26-7.

From 1987-1996 Clarke worked as a National Field Service Engineer for Lotus in the United States. *Id.* at 29. There, he conducted tested vehicles to determine whether they met vehicle standards, proposed design changes, but did not actually design components. *Id.* at 29-49. From 1996 to the present Clarke has been engaged as a Consulting Engineer providing technical expertise on engineering investigations of failed and accident-related components. He has been involved in over 100 vehicle fire investigations. Clarke worked extensively with the National Highway Traffic Safety Administration in order to identify a defect in a Ford Motor Company component that caused fires; he played a pivotal role in proposing two alternative designs, one of which was used by Ford.

He has not received any formal education with regard to vehicle aerodynamics. *Id.* at 49. Clarke states that in the course of his career he has learned about aerodynamic issues with

respect to airflow and vehicles, particularly when working for the Formula 1 Race Team. (*Id*. at 47-9, Doc. 81-6 at ¶11).

### B. Procedural Background

Plaintiffs filed their Complaint on December 28, 2011. On May 30, 2014 Defendants filed their Motion in Limine to Exclude the Testimony of Richard Clarke, (Doc. 77), and their Motion for Summary Judgment on all claims against the BMW Defendants. (Doc. 78). On July 3, 2014, Plaintiffs filed their motion to Strike Affidavits of Thomas Slaba and Richard Keefer attached to Defendants' Motion for Summary Judgment. (Doc. 83). All three motions have been fully briefed and, therefore, are ripe for review.

### III. ANALYSIS

### A. Motion to Exclude Testimony of Richard Clarke

This Court first addresses Defendants' motion to exclude the expert testimony of Richard Clarke. (Doc. 77). Rule 702 provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based on sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Defendants argue that Clarke is not a design engineer, and thus is not qualified to: (1) opine on whether there is a design defect in the vehicle; or (2) offer an alleged safer alternative design. Defendants further offer that Clarke's conclusions are not reliable as they do not meet the *Daubert* reliability factors, and are not relevant because they ignore evidence in the record.

### *1. Legal Standard*

Under Rule 702, an expert's opinion is admissible, by the discretion of the trial court, if: (1) the expert is qualified as such by knowledge, skill, experience, training, or education; (2) the testimony is relevant, meaning it will assist the trier of fact to understand the evidence or to determine a fact in issue; and (3) the testimony is reliable, meaning it is based on sufficient facts or data, is the product of reliable principles and methods, and the witness has applied the principles and methods reliably to the facts of the case. *In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 528-29 (6th Cir. 2008).

In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, the Supreme Court held that while the evaluation of expert testimony is generally left to juries, district courts must serve in a "gatekeeping" capacity, "ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." 509 U.S. 579, 597-98 (1993). *Daubert* set forth a non-exclusive check-list for assessing the reliability of scientific expert testimony: (1) whether the theory or methodology has been or can be tested; (2) whether it has been subjected to peer review; (3) whether it has a known or potential rate of error; and (4) whether it has been generally accepted in the scientific community. *Id.* at 593-94.

In *Kumho Tire Co. v. Carmichael*, the Supreme Court clarified that the reliability inquiry *Daubert* outlined covers not just scientific testimony, but also expert testimony based on—in the language of Rule 702—"technical" and "other specialized knowledge." 526 U.S. 137 (1999). In *Kumho* the Supreme Court also recognized, however, that the *Daubert* factors "may or may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's particular expertise, and the subject of his testimony." *Kumho Tire,* 526 U.S. at 150; *see Gross v. Comm'r,* 272 F.3d 333, 339 (6th Cir. 2001) (explaining that the *Daubert* factors "are not dispositive in

every case" and should be applied only "where they are reasonable measures of reliability of expert testimony").

This Circuit has held that an expert must utilize in the courtroom the "same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Best v. Lowe's Home Ctrs., Inc.,* 563 F.3d 171, 177 (6th Cir. 2009) (internal quotation marks omitted). Determining the admissibility of expert testimony pursuant to Rule 702, however, entails a flexible inquiry. *Daubert,* 509 U.S. at 594. The burden on a party proffering expert testimony is to "show by a preponderance of proof that the expert whose testimony is being offered is qualified and will testify to scientific knowledge that will assist the trier of fact in understanding and disposing of relevant issues." *Sigler v. Am. Honda Motor Co.,* 532 F.3d 469, 478 (6th Cir. 2008) (citing *Pride v. BIC Corp.,* 218 F.3d 566, 578 (6th Cir.2000)) (internal quotation marks omitted).

Where the reliability of the evidence is in dispute, it is more appropriate for a judge to admit the evidence than to keep it from the fact-finder because "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert,* 509 U.S. at 596.

### *2. Clarke's Qualifications*

Initially, a witness must establish his or her expertise by reference to "knowledge, skill, experience, training, or education" in order to qualify as an expert under Rule 702. Although the "qualification" element of the Rule 702 analysis "is typically treated liberally, a witness is not an expert simply because he claims to be." *Rose v. Truck Centers, Inc.*, 388 F. App'x 528, 533 (6th Cir. 2010). "The issue with regard to expert testimony is not the qualifications of a witness in the

abstract, but whether those qualifications provide a foundation for a witness to answer a specific question." *Berry v. City of Detroit,* 25 F.3d 1342, 1351 (6th Cir.1994).

Defendants argue that in a design defect claim, Plaintiffs must offer evidence, through expert testimony, that the foreseeable risks of the vehicle's design exceeded the benefits associated with the design. Further, Defendants argue that the burden is on the Plaintiffs to show that "a practical and technically feasible alternative design ... would have prevented the harm for which the claimant seeks to recover...." Ohio Rev.Code § 2307.75(F). In light of these standards for establishing a design defect claim, Defendants contend that Clarke's education and experience do not qualify him to engage in a critical analysis of the risks and benefits associated with the vehicle's design, nor to provide testimony on a practical and technically feasible alternative design of the stiffener plate.

Defendants concede that Clarke is qualified as an expert in Failure Mode Analysis with respect to vehicle fires, and thus qualified to opine on the cause and origin of fire in the vehicle. They argue, however, that the origin of fire is not at issue in this case. Instead, they contend that Clarke's qualification as a fire analyst is irrelevant to the pending issues in this case including: (1) the cause of the accumulation of debris; (2) whether the foreseeable risk of the design of the stiffener plate exceeded the benefits associated with its design; and (3) whether Clarke's alternative design of the stiffening plate was practical, technically feasible and would have prevented the fire. Defendants assert that Clarke's experience and education are irrelevant to these design-specific questions because he is not a licensed engineer and neither his experience nor education includes scientific principles of vehicle design or expertise in vehicle aerodynamics.

Plaintiffs respond that Mr. Clarke's opinion is not that the presence of openings in the BMW is the defect. Rather, the defect in the vehicle is that debris was naturally permitted to accumulate in the engine compartment in close proximity to heated surfaces due to the design of the stiffener plate, which lacks any holes to permit self-cleaning, and which has six protruding bolts that trap debris. He opines that this is what caused the fire, and that a change in the stiffener plate would have prevented the fire. Plaintiffs contend that Clarke is qualified to offer these opinions because he has a four-year degree in Automotive Engineering and has been involved in the automotive industry since 1982. He has investigated hundreds of vehicle fires in his career, in which he has evaluated whether conditions in the vehicle constituted a faulty or defective condition that caused a fire or injury and whether that condition could be remedied feasibly in order to prevent an accident. Mr. Clarke proposes alternative designs in his current consulting position, and proposed alternative designs in his previous position as a National Field Service Engineer for Lotus, for General Motors, and for the Lotus Formula 1 racing team. Further, Plaintiffs argue that the stiffener plate is not a complex car component that requires particularized design knowledge, and that his alternative design is already in use in newer models of the vehicle.

As a basis to exclude Clarke's testimony, Defendants liken Clarke to a mechanic with no greater knowledge of mechanical engineering principles than the average juror, and rely on *Sigler v. Am. Honda Motor Co.,* 532 F.3d 469 (6th Cir. 2008) and *Rose v. Truck Centers, Inc.*, 611 F. Supp. 2d 745 (N.D. Ohio 2009) *aff'd,* 388 F. App'x 528 (6th Cir. 2010). Defendants argue that in both cases, courts excluded mechanics from testifying about vehicle defects and causation, because they found such conclusions exceeded the scope of the mechanic's expertise.

Defendants ignore, however, that the Appellate Court in *Rose* overturned the district court's determination that the mechanic did not qualify as an expert because he lacked the formal education, training, and experience to offer an opinion regarding whether the steering gear was defective. *Rose v. Truck Centers, Inc.*, 388 F. App'x 528, 534 (6th Cir. 2010). Instead, the Appellate Court held that the mechanic was "qualified as an expert since his testimony would certainly assist the trier of fact in understanding the evidence." *Id*. Specifically, the Appellate Court found that the record showed the mechanic's experiences gave him specialized knowledge in the areas of truck mechanics and steering gears and that he understood the process of torqueing the steering gear bolts and how a misstep could have caused an accident. *Id*. In addition, the Appellate Court in *Rose* noted that in *Sigler*, the Court had similarly found the mechanic to be an "expert with regard to analyzing an automobile after an accident," and only excluded him as an expert because they "concluded that he lacked the expertise to render opinion about an airbag defect *without physically examining the vehicle,* which he had failed to do." *Id*. The Appellate Court in *Rose* held, accordingly, that the case before them was distinguishable from *Sigler* because Plaintiff's expert had examined the faulty vehicle. *Id*. The Appellate Court went on to hold, however, that while the mechanic in the case before them was qualified as an expert to opine on the steering gear's malfunction, his opinion was unreliable because his methods were unreliable—the evidence that he relied upon had been altered and thus could not reasonably support his expert opinions. *Id*.

Defendants offer an alternative argument, that even if Clarke is deemed to have sufficient education or experience in some respects, Rule 702 requires experts to have specialized knowledge, which Clarke lacks in the area of engine compartment covers, and aerodynamics and airflow issues. In *Newell Rubbermaid, Inc. v. Raymond Corp.*, the Court held that while a

witness was a highly educated licensed engineer with board certification in forensic engineering, and a member of six professional societies, he lacked any specialized knowledge in forklifts, the product at issue in the case, and could not be identified as an expert in the field of forklifts. No. 5:08-CV-2632, 2010 WL 2643417, at *3 (N.D. Ohio July 1, 2010) *aff'd,* 676 F.3d 521 (6th Cir. 2012). The Court noted as persuasive in its decision to exclude the witness that the witness had never designed any component of a forklift, nor consulted with a forklift manufacturer with respect to the design of a forklift. *Id.* at 4. In *Early v. Toyota Motor Corp.*, 277 F. App'x 581, 584-87 (6th Cir. 2008), the Court excluded a witness who had a degree in mechanical engineering, but no license, and also who had no specific experience in automotive design or manufacturing, or experience in the design or installation of a dust seal, the car component at issue in that case. Clarke similarly has no engineering license, though he has experience in the automotive industry, and in assessing defects and recommending designs. He does not, however, hold himself out to be a design expert.

In response, Plaintiffs present cases to support the argument that the details of Clarke's academic qualifications bear on the weight of Clarke's testimony, not its admissibility. Further, they argue that his experience in the automotive industry and vehicle fires permit him to testify on the design issues in this case as they relate to fire cause and prevention, even if he does not have specialized knowledge of under-engine covers. *See Benton v. Ford Motor Co.*, 492 F. Supp. 2d 874, 876-78 (S.D. Ohio 2007) (holding "where the opposing side has the opportunity to cross-examine an expert regarding his qualifications and where the jury is properly instructed to determine for itself the weight and credibility to be given to the expert's testimony, an argument opposing admissibility of the testimony on the grounds that it is outside the witness's area of expertise must fail."); *see also Williams v. Gen. Motors Corp.*, No. 1:03-CV-02060, 2007 WL

3232292, at *1-2 (N.D. Ohio Oct. 30, 2007); *Floyd v. Pride Mobility Products Corp.*, No. 1:05-CV-00389, 2007 WL 4404049, at *2-5 (S.D. Ohio Dec. 12, 2007).

In *Benton*, a vehicle rollover case, the Court found it immaterial that the expert had no formal education or background in the automotive industry. *Id*. The Court held that his experience in accident reconstruction, which entailed an understanding in vehicle design and dynamics applied to the more than 50 roll-over accidents he has analyzed and the use of the stability index ratio, qualified him as an expert as to the design issues in this case. *Id*. In *Williams v. Gen. Motors Corp.*, No. 1:03-CV-02060, 2007 WL 3232292, at *1-2 (N.D. Ohio Oct. 30, 2007), the Court rejected arguments that an expert was not qualified to testify on fuel system design because he was not a licensed engineer, and had no specific expertise in fuel system design for medium-duty trucks, the area of his proposed testimony. The *Williams* Court found that the proposed expert was experienced in various areas of the automotive industry and mechanics, and had post-graduate study in Industrial Design and Technology and a specialization in Automotive Technology. Further, he had been accepted by various courts as an expert, including one where he testified on the same vehicle component that was at issue in the case. Finally, in *Floyd v. Pride Mobility Products Corp.*, No. 1:05-CV-00389, 2007 WL 4404049, at *2-5 (S.D. Ohio Dec. 12, 2007), the Court relied on *Benton* to hold that an expert could opine on alternative designs of scooters—even though he was not involved in the scooter industry and had no design background—because the expert relied on experience and sufficient data related to accident scene.

Like in *Rose*, this Court agrees that "Rule 702 should be broadly interpreted on the basis of whether the use of expert testimony will assist the trier of fact." 388 F. App'x at 534 (citing *Davis v. Combustion Eng'g, Inc.,* 742 F.2d 916, 919 (6th Cir.1984)). Clarke is a thirty-two year

veteran of the automotive industry, qualified to offer opinions about causation, prevention and design as it relates to fire cause and prevention. As such this Court finds Clarke's opinions will assist the trier of fact. The scope of his expertise in vehicle design and engineering may cut against the weight of his testimony regarding the vehicle defect and an alternative design, but not its admissibility.

Unlike the expert in *Newell*, who had no background in the forklift industry, Clarke has a range of experiences in vehicle mechanics and design, including some experiential background in aerodynamics, and extensive experience in assessing car defects as it relates to fire defects, and prevention. Further, like in *Benton*, while Clarke does not have a design degree, his experience in investigating hundreds of vehicle fires, and in analyzing car defects and recommending alternatives in his current position as a consulting engineer and in his previous position as National Field Service Engineer for Lotus, qualify him to conclude the origin of a fire and how the vehicle could have been modified to prevent such a fire. Even if his qualifications arguably fall short of his ability to testify on the feasibility and risks versus benefits of his stiffener plate design, there is no need for him to theorize because he offers testimony that his alternative design is already in use by BMW's newer models of the vehicle. *See Simo v. Mitsubishi Motors N. Am., Inc.*, 245 F. App'x 295, 299-300 (4th Cir. 2007) (finding that there was no need to determine whether expert witness qualified to testify regarding an alternative car design to remedy risk of rollover because the expert testified that a feasible alternative design was already on the market). Lastly, the Court follows the rationale in *William* and *Floyd*, that under the facts of this case, Clarke need not have specialized knowledge of the exact component at issue, the stiffener plate, in order to make conclusions that assist the trier of fact. Clarke's

experience in the automotive industry and his observations of the vehicle and exemplar vehicles provide a sufficient foundation for him to opine on the vehicle defect and an alternative design.

### 3. Reliability of Clarke's Conclusions

Next, this Court must analyze whether the evidence offered by Clarke rests on reliable reasoning and methodology. Although the test of reliability is "flexible," and there is no "definitive checklist or test," *Daubert* did set forth factors to consult when evaluating the reliability of expert testimony, including: testing, peer review, publication, error rates, the existence and maintenance of standards controlling the technique's operation, and general acceptance in the relevant scientific community. *Kumho,* 526 U.S. at 150 (citing *Daubert,* 509 U.S. at 593-94). The *Daubert* factors "are not dispositive in every case" and should be applied only "where they are reasonable measures of the reliability of expert testimony." *In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 529 (6th Cir. 2008) (citing *Gross v. Comm'r,* 272 F.3d 333, 339 (6th Cir.2001)).

Defendants argue that Clarke's analysis of the vehicle fire, which was limited to inspecting the vehicle in question, and inspecting an exemplar 2009 BMW 328xi, is not sufficient to support his conclusions regarding the alleged vehicle defect and his proposed alternative design. He did not test his theory that the vehicle's aerodynamics or airflow permit debris to enter through openings in the hood, through NACA ducts, or through any other way during normal use of the vehicle. Further, Clarke is not specific about which openings allegedly allowed in the debris. (Doc. 70 at 95-96). In addition, Clarke did not identify any other fires in similar vehicles attributable to the alleged defect, nor did he conduct testing or analysis to determine whether all 2007 BMW 328xi's are similarly defective.

17

As to the feasibility of Clarke's alternative design of the stiffener place, Defendants argue that Clarke has not tested his design's strength, structural integrity, aerodynamic properties, or its airflow properties. Defendants contend that Clarke's design, which he labeled "primitive," ignores the benefits associated with the stiffener plate as designed, including: controlling noise emissions, reducing drag, and making the car more fuel efficient. Defendants contend that the scientific community would not accept a non-engineer offering an aerodynamic design change to a vehicle without applying engineering principles. Also, Defendants argue that Clarke developed this design and his theory about the stiffener plate for the purposes of litigation. Finally, Clarke's theory about the risk of debris fires due to the construction of stiffener plates, as well as his alternative design, have not been subject to peer review or validation, or the subject of any other publication to Defendants' knowledge.

Plaintiffs respond that the design issues in this case are simple, considering the stiffener plate is a solid piece of aluminum connected to the underside of the vehicle. Relying on *Nemir v. Mitsubishi Motor Sales of Am., Inc.*, 6 F. App'x 266 (6th Cir. 2001), Plaintiffs argue that Clarke's opinions are derived from inferences based on a scientific method and that those inferences are derived from the facts of the case. *Id*. (holding that *Daubert* requires "only that the expert testimony be derived from inferences based on a scientific method and that those inferences be derived from the facts of  the case at hand ... not that they know the answers to all the questions a case presents-even to the most fundamental questions."). Plaintiffs contend that Clarke utilized the scientific method when he concluded that the design defect was the position and construction of the stiffener plate. First, Clarke considered that all post-fire examination of the vehicle found that organic debris wedged in the area of the stiffener plate and next to the exhaust system was the cause of the fire. Next, testing performed by Plaintiffs' expert, Keaton, confirmed that the

temperatures generated in the exhaust system were sufficient to ignite that material. After that, Clarke inspected the vehicle and determined that the debris got trapped in the area between the stiffener plate and exhaust component because the stiffener plate had no openings and had protruding bolts where debris likely got stuck. Finally, he considered the design of the vehicle and examined two exemplars that had holes in the stiffener plate.

Relying on *Nemir*, Plaintiffs contend that although two competing theories exist as to how the debris got lodged on the stiffener plate, the determination of which theory is more credible is a question for the jury. *Id*. at 275 (holding that when possibilities besides those offered by experts exist with regards to causation, the "fact that several possible causes might remain 'uneliminated'... only goes to the accuracy of the conclusion, not the soundness of the methodology"). Further, Plaintiffs state that Clarke offered the opinion that the risk of fire inherent in the design of the stiffener plate outweighed any benefits that the stiffener plate offers, considering the serious consequences of a vehicle fire. In addition, Plaintiffs offer ample cases showing this Circuit has held consistently that an expert's failure to perform his own independent tests or studies of his alternative design or theories goes to the weight of his testimony, not to its admissibility.

This Court finds that Clarke's methodology in assessing the defect and proposing an alternative design was sufficiently reliable considering the facts of the case. As the Court stated in *Kumho*:

> Experts of all kinds tie observations to conclusions through the use of what Judge Learned Hand called "general truths derived from ... specialized experience." Hand, Historical and Practical Considerations Regarding Expert Testimony, 15 Harv. L. Rev. 40, 54 (1901). And whether the specific expert testimony focuses upon specialized observations, the specialized translation of those observations into theory, a specialized theory itself, or the application of such a theory in a particular case, the expert's testimony often will rest "upon an experience confessedly foreign in kind to [the jury's] own." *Ibid.* The trial judge's effort to assure that the specialized testimony is reliable

and relevant can help the jury evaluate that foreign experience, whether the testimony reflects scientific, technical, or other specialized knowledge.

*Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 148-49 (1999).

Here, Clarke, a specialist in fire causation in vehicles, with thirty-two years of experience in the technical side of the automotive industry, translated specialized observations into a theory about the fire's origin and ways to prevent like fires. His theory regarding a modified stiffener plate is very basic, and other such stiffener plates exist on the market, including in the subject vehicle's newer model. Further, Clarke's contention that the benefits inherent in the stiffener plate as designed—including better gas mileage, aerodynamics and internal heating—do not outweigh the deadly risk of fire, is also sufficiently straightforward. Accordingly, the risk/benefit analysis in this case is a question more appropriate for the jury, and not for summary judgment. As such, the Court finds that Clarke's failure to test the aerodynamics of his alternative design goes to weigh, not to admissibility of his testimony. *See Clay v. Ford Motor Company,* 215 F.3d 663, 668 (6th Cir.2000) (failure to test goes to weight not admissibility); *accord Williams* 2007 WL 3232292, at *2 (N.D. Ohio Oct. 30, 2007) (holding that an expert witness presented reliable testimony, even though he did not perform any testing and his theory was not generally accepted, because conclusions were "supported by rational explanations and his methods d[id] not strike the court as novel or extreme").

### 6.  *Relevance of Clarke's Conclusions*

Defendants argue that Clarke's conclusions are not relevant because his conclusions are based on unsupported assumptions, and his theories do not fit the facts of this case. Specifically, Defendants argue that Clarke ignores evidence that Defendants placed in the record—including

20

evidence of extensive airflow and aerodynamic testing and evaluation done on the E90 platform—showing that debris cannot infiltrate the engine compartment. Defendants claim that Clarke also ignored that he could not identify another vehicle with a similar design where openings around the hood allowed infiltration and accumulation of debris in the engine, thus causing a fire. Further, Defendants assert that Clarke ignores that the two exemplar vehicles that both parties inspected had substantially more miles than the subject vehicle and were not found to contain debris in the under-engine compartment covers. Lastly, Defendants argue that Clarke did not inspect the under-engine compartment attached to the exemplar 2009 BMW 328xi he inspected a week before the deposition to see if debris had collected there. Thus, Defendants argue, the facts available in the case do not support Clarke's conclusions and are not relevant because they will not assist jurors, but merely confuse them.

In *Daubert*, the Supreme Court emphasized that in addition to examining the reliability of the expert's testimony, the trial court must ensure that the proposed expert testimony is "relevant to the task at hand." *Daubert,* 509 U.S. at 580. The relevance requirement in the Rule 702 inquiry "relates to the 'fit' of the testimony, that is, 'whether the reasoning or methodology properly can be applied to the facts in issue [,]' *Daubert,* 509 U.S. at 593, so as to assist the trier of fact." *Newell Rubbermaid, Inc.,* 2010 WL 2643417, at *9-10. Further, the trial court must determine whether the expert's training and qualifications relate to the subject matter of his proposed testimony. *Smelser v. Norfolk S. Ry. Co*., 105 F.3d 299, 303 (6th Cir. 1997).

The relevancy prong goes to whether the proposed testimony is probative of a material issue in the case. ' *Daubert,* 509 U.S. at 580, 593. The Court has already determined that Clarke's background in the automotive industry and failure mode analysis qualifies him to offer testimony on the cause of the fire, the defect that contributed to the fire, and an alternative

design. Whether Defendants will proffer evidence undermining such conclusions is a matter for the jury, but does not go to the relevancy of Clarke's opinions. Additionally, this Court has already determined that Clarke's methodology in determining the vehicle's defect and proposing an alternative design, albeit limited, was sufficient considering the facts in the case. Thus, while Defendants are free to undermine the reliability of such methodology on cross-examination, Clarke's proposed testimony regarding the cause of the fire, the defect, and the alternative design is relevant to material issues in dispute in this case.

As this Court has found Richard Clarke's testimony satisfies Rule 702, Defendants' Motion to Exclude the Testimony of Richard A. Clarke, (Doc. 77), is hereby **DENIED**.

### B. Plaintiff's Motion to Strike the Affidavits of Thomas Slaba and Richard Keefer

Next, this Court will address Plaintiffs' Motion to Strike the Affidavits of Thomas Slaba and Richard Keefer, attached to their Response to Defendants' Motion for Summary Judgment. (Doc. 83).

### 1. *Slaba's Affidavit*

Thomas Slaba provided deposition testimony in this case in response to Plaintiffs' Federal Rule of Civil Procedure 30(b)(6) notice served upon BMW AG. The deposition notice requested that Mr. Slaba testify with respect to any evaluation, analysis, testing or inspections performed by BMW AG or any other contracted individuals, to determine the potential for fires in the vehicle as a result of the accumulation of unintended debris in the areas of the catalytic converters or the exhaust down pipes. When asked in his deposition whether BMW performed any testing to determine whether combustible debris such as foliage, leaves and other organic matters could accumulate next to the stiffener plate, Slaba responded:

> There was no specific testing done with regard to the accumulation of debris, but the vehicles were subject to regular testing where they are also inspected for dirt

and debris…when we do normal testing of the vehicle, it did not show that things like that would happen.

(Slaba Deposition, Doc. 74 at 54-56). Then, in his affidavit attached to the Defendants' Motion for Summary Judgment, Slaba states:

The design, research and development of the E90 platform included extensive airflow and aerodynamics design, research and development. No evidence of 'debris' infiltrating the engine compartment via 'openings in the hood,' or in any other fashion, was ever discovered.

(Doc. 78-2 at ¶¶ 26-7).

Plaintiffs argue that the Court should disregard the affidavit testimony regarding aerodynamic testing of the vehicle because such testimony contradicts Slaba's prior deposition testimony. Further, Plaintiffs rely on *Pluck v. BP Oil Pipeline Co.*, 640 F.3d 671, 681 (6th Cir. 2011), and a similar line of cases, to argue that this Circuit has repeatedly rejected affidavits submitted by witnesses in the context of summary judgment when such information offered in the affidavits was available at the time of the deposition but not disclosed. Plaintiffs contend that Clarke's affidavit opinion regarding the aerodynamic testing of the vehicle was available at the time of his deposition but not disclosed, and, thus, should be stricken.

Defendants respond that Slaba's affidavit merely reiterates his deposition testimony and expounds upon it to provide the Court with the details and facts supporting his conclusions, which Plaintiffs failed to address during the deposition.

Both parties rely on *Aerel, S.R.L. v. PCC Airfoils, L.L.C.*, 448 F.3d 899 (6th Cir. 2006) for the standard this Court should apply when determining the admissibility of a post-deposition affidavit at summary judgment. *Aerel* held that the first step in such an inquiry is to "determine whether the affidavit directly contradicts the nonmoving party's prior sworn testimony. . . . A directly contradictory affidavit should be stricken unless the party opposing summary judgment

23

provides a persuasive justification for the contradiction." *Id*. at 908. If, however, the district court finds no contradiction, then it should not "strike or disregard that affidavit unless the court determines that the affidavit 'constitutes an attempt to create a sham fact issue.'" *Id*. To determine whether the affidavit is an attempt to create a sham fact issue, the court can look to a nonexhaustive list of factors, including, "whether the affiant was cross-examined during his earlier testimony, whether the affiant had access to the pertinent evidence at the time of his earlier testimony or whether the affidavit was based on newly discovered evidence, and whether the earlier testimony reflects confusion [that] the affidavit attempts to explain." *Id*.at 909.

This Court holds that Slaba's affidavit does not contradict his deposition testimony regarding aerodynamic testing of the vehicle, but rather restates what was already contradictory and/or unclear testimony in his deposition. On the one hand, Slaba's deposition testimony can be interpreted to mean that no aerodynamic testing was done specifically regarding the stiffener plate; on the other hand, the deposition testimony can be interpreted to mean that Slaba's opinion of the BMW aerodynamic testing is that the results excluded the possibility of such a build-up of debris near the stiffener plate. His affidavit is similarly contradictory and/or unclear: it states that BMW conducted unspecified aerodynamic testing on the vehicle, which did not reveal evidence of debris infiltrating the engine compartment via openings in the hood or otherwise. Such testimony does not confirm or deny that specific aerodynamic testing was done concerning collection of debris on the stiffener plate, only that in the unspecified testing performed, no such evidence was discovered. As the affidavit merely restates what was already contradictory or unclear deposition testimony, this Court need not address whether such testimony is an attempt to raise a sham fact. Instead, the affidavit testimony adds no new facts to the case. Accordingly, this Court hereby **DENIES** Plaintiffs' Motion to Exclude the Slaba's Affidavit.

## 2. *Affidavit of Richard Keefer*

In their witness disclosures, Defendants produced the report of Richard Keefer, a licensed engineer, who inspected the vehicle and evaluated Mr. Clarke's claims that the vehicle was defectively designed. Plaintiffs argue that Keefer's affidavit attached to Defendants' Motion for Summary Judgment contains untimely disclosed expert opinion, and should be stricken.

Plaintiffs argue that in Keefer's November 18, 2013 expert report, he notes: "examination of the accident and exemplar vehicle and their underbody covers indicates area of small openings that would permit access to the underbody of the vehicle as well as airflow." (Doc. 83-5). In Keefer's Deposition, Plaintiffs asked him whether his report included any opinion as to how combustible materials made its way to the ignition surface of the exhaust, or whether Clarke's opinions of how material got onto the hot surface were correct. Keefer responded that he did not offer either of those opinions in his report. (Doc. 83-6). Then, when asked if he thought debris could enter via the hood, he stated that he thought it could not. Keefer did not offer a specific opinion about how debris could enter the engine compartment, nor was he asked to offer such an opinion. In his affidavit, however, he details with specificity why debris could not have entered through the hood.

Plaintiffs argue that they are entitled to rely on expert disclosures by an adverse party in developing deposition questioning. Plaintiffs contend that Defendants knew of Clarke's opinion concerning openings in the hood three weeks prior to the deposition, and that Keefer should have produced a supplemental expert report setting forth his detailed opinions about why debris could not have entered via the hood.

Defendants respond that Keefer made clear he did not think debris could enter via the hood during his deposition, and that his affidavit merely expounded upon those opinions because Plaintiffs failed to ask any follow-up questions regarding Keefer's opinion.

This Court finds that Plaintiffs were free to ask detailed questions regarding Keefer's opinion and failed to do so. Plaintiffs were on notice from Keefer's report that Keefer believed debris had entered via openings in the under-body cover, and not openings in the hood. Further, Plaintiffs were aware that Keefer did not think debris could enter via the hood due to his responses in the deposition itself. As such, this Court **DENIES** Plaintiffs' Motion to Exclude Keefer's Affidavit.

### C. Summary Judgment

The Court will now address Defendants' Motion for Summary Judgment on Plaintiffs' following claims: (1) breach of implied warranty against both BMW Defendants (Count IV); (2) product liability under OPLA against the manufacturer, BMW AG (Count III); and (3) product liability under the Ohio Product Liability Act ("OPLA") against the supplier, BMW NA (Count II). (Doc. 78).

### 1. Standard for Summary Judgment

Federal Rule of Civil Procedure 56 provides, in relevant part, that summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." A fact is deemed material only if it "might affect the outcome of the lawsuit under the governing substantive law." *Wiley v. United*

*States,* 20 F.3d 222, 224 (6th Cir. 1994) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)).

The necessary inquiry for this Court is "whether 'the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Patton v. Bearden,* 8 F.3d 343, 346 (6th Cir. 1993) (quoting *Anderson,* 477 U.S. at 251-52). In evaluating such a motion, the evidence must be viewed in the light most favorable to the nonmoving party. *United States S.E.C. v. Sierra Brokerage Servs., Inc.*, 712 F.3d 321, 327 (6th Cir. 2013). The court reviewing a summary judgment motion need not search the record in an effort to establish the lack of genuinely disputed material facts, however. *Guarino v. Brookfield Township Trustees*, 980 F.2d 399, 404 (6th Cir.1992). Rather, the burden is on the nonmoving party to present affirmative evidence to defeat a properly supported motion, *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir.1989), and to designate specific facts that are in dispute. *Anderson*, 477 U.S. at 250; *Guarino*, 980 F.2d at 404–05.

To survive the motion the nonmoving party must present "significant probative evidence" to show that "there is [more than] some metaphysical doubt as to the material facts." *Moore v. Philip Morris Cos., Inc.,* 8 F.3d 335, 339-40 (6th Cir. 1993). The mere existence of a scintilla of evidence in support of the opposing party's position will be insufficient to survive the motion; there must be evidence on which the jury could reasonably find for the opposing party. *See Anderson,* 477 U.S. at 251; *Copeland v. Machulis,* 57 F.3d 476, 479 (6th Cir. 1995); *see also Mitchell v. Toledo Hospital,* 964 F.2d 577, 582 (6th Cir. 1992) (finding that the suggestion of a mere possibility of a factual dispute is insufficient to defeat a motion for summary judgment) (citing *Gregg v. Allen-Bradley Co.,* 801 F.2d 859, 863 (6th Cir. 1986)).

### *2. Count IV: Implied Warranty Claim*

First, Defendants assert that OPLA abrogates Plaintiffs' breach of implied warranty

claim, entitling Defendants to summary judgment as a matter of law on Count IV. OPLA states

that its sections "are intended to abrogate all common law product liability claims or causes of

action." O.R.C. § 2307.71(B). OPLA defines a "product liability claim" as:

> a claim or cause of action that is asserted in a civil action pursuant to sections
> 2307.71 to 2307.80 of the Revised Code and that seeks to recover compensatory
> damages from a manufacturer or supplier for death, physical injury to person,
> emotional distress, or physical damage to property other than the product in
> question, that allegedly arose from any of the following:
>
> (a) The design, formulation, production, construction, creation, assembly,
> rebuilding, testing or marketing of that product;
> (b) Any warning or instruction, or lack of warning or instruction, associated with
> that product;
> (c) Any failure of that product to conform to any relevant representation or
> warranty.

§ 2307.71(A)(13). Defendants argue that since OPLA abrogates all common law product defects

claims, which by OPLA's definition includes any failure of a product to conform to any relevant

representation or warranty, OPLA accordingly preempts Plaintiffs' common law breach of

implied warranty claim.

Plaintiffs respond that they bring the breach of warranty claim solely to recover for

economic damages—i.e., the vehicle itself and incidentals related to the Patrick's lodging while

their home was being repaired—and not for compensatory damages related to damage to the

Patricks' home. By its language, Plaintiffs argue, OPLA does not abrogate such a claim, since

OPLA defines a product liability claim as one that seeks to recover compensatory damages, not

economic damages, for physical injury to person, emotional distress, or physical damage to

property other than the product in question. Further, Plaintiffs argue that O.R.C. § 2307.72(C)

supports their reading of O.R.C. § 2307.71(A)(13). O.R.C. § 2307.72(C) is an OPLA provision

covering damages, and it states:

> **Any recovery** of compensatory damages **for economic loss based on a claim that is asserted in a civil action, other than a product liability claim,** is not subject to sections 2307.71 to 2307.79 of the Revised Code, but **may occur under the common law of this state . . .**

O.R.C. § 2307.72(C) (emphasis added).

To be clear, although OPLA does not classify a claim for economic damages as a

"product liability claim," that does not mean that OPLA precludes recovery of economic

damages entirely. Instead, OPLA makes any recovery of economic damages contingent on an

award of compensatory damages:

> (A) If a claimant is entitled to recover compensatory damages for harm from a manufacturer in accordance with section 2307.73 of the Revised Code or from a supplier in accordance with division (B) of section 2307.78 of the Revised Code, the claimant may recover from the manufacturer or supplier in question, in that action, compensatory damages for any economic loss that proximately resulted from the defective aspect of the product in question.

O.R.C. § 2307.79(A). In other words, under OPLA, recovery on the Patricks' vehicle is

derivative of Plaintiffs' success in showing that a design defect in the vehicle damaged the

Patricks' home.

Courts in this Circuit have held that to the extent a Plaintiff brings common law claims

for breach of implied warranty in tort and negligence for defective design and failure to warn,

seeking purely economic damages, and does not bring any claims under OPLA for compensatory

damages, OPLA does not abrogate those common law claims. *In re Whirlpool Corp. Front-*

*Loading Washer Products Liab. Litig.*, No. 1:08-WP-65000, 2014 WL 4674670, at *11 (N.D.

Ohio Sept. 19, 2014) (citing *Hoffer v. Cooper Wiring Devices,* 2007 WL 1725317 (N.D.Ohio

June 13, 2007) (Boyko, J.)).

The case *sub judice* is distinguishable from *Whirlpool*, however, because Plaintiffs bring

both an OPLA claim for compensatory damages, and also a common law negligence claim for

economic damages, under the same set of facts. Accordingly, Plaintiffs urge this Court to follow

*Huffman v. Electrolux N. Am., Inc.*, which held that a Plaintiff may bring, simultaneously, a

common-law products liability claim for purely economic damages and an OPLA claim for

compensatory damages, even if both claims are based on the same set of underlying facts, so

long as the claims are pled in the alternative.  961 F. Supp. 2d 875, 881 (N.D. Ohio 2013) *on*

*reconsideration sub nom. Huffman v. Electrolux Home Products, Inc.*, No. 3:12CV2681, 2013

WL 5591939 (N.D. Ohio Sept. 30, 2013).

 In *Huffman*, Plaintiff sued Defendant under both OPLA and common law implied

warranty claims for a washing machine that smelled of mold. Plaintiff sought compensatory

damages under her OPLA claim, and only economic loss damages under her common-law

claims. *Id*. at 878. The *Huffman* Court acknowledged that it is uncontested that the "General

Assembly amended the OPLA to make clear that it had intended for the Act to supersede

common-law negligence claims," including implied warranty claims. *Huffman*, at 879 (citing

*Wimbush v. Wyeth*, 619 F.3d 632, 639 (6th Cir.2010)). The *Huffman* Court noted, further, that "it

is well-established that under the OPLA, claimants cannot recover only economic damages."

*Huffman* at 881(citing *State Farm Mut. Auto. Ins. Co. v. Kia Motors Am., Inc.*, 160 Ohio App.3d

727, 734, 828 N.E.2d 701 (2005). Lastly, the Court recognized precedent in the case *Mitchell v.*

*Proctor & Gamble*, which held that:

> a plaintiff cannot bring a common-law negligence claim for economic damages
> where the actionable conduct that forms the basis of the negligence claim ... is the
> same conduct that ... giv[es] rise to [the] products liability claim. The [*Mitchell*]
> court further stated a plaintiff cannot separate out his claims from the purview of
> the OPLA simply by claiming only economic losses.

*Huffman* at 880 (internal quotations and citations omitted).

The *Huffman* Court declined to follow *Mitchell*, however, because doing so meant that a plaintiff would have to choose between recovering only for economic loss under a common law negligence theory, or bringing an OPLA claim, with the risk that failure to establish a compensatory damages claim under OPLA would bar the plaintiff's contingent right to economic damages:

> Given the [OPLA's] prohibition on recovering solely economic loss damages, the court's decision in *Mitchell*—that a plaintiff asserting an OPLA claim cannot bring common-law claims arising out of the same alleged defect—turns a plaintiff's recovery of economic loss damages into a gamble. The court's decision requires plaintiffs to choose between a relatively certain recovery of economic loss damages and the possible recovery of compensatory damages plus economic loss damages.

*Id*. at 881.

The *Huffman* Court determined, accordingly, that "Ohio law does not support circumscribing a plaintiff's right to the remedy of economic loss damages. Under Ohio law, the right to a remedy, and more specifically, a consumer's right to recover solely economic loss damages is well-established." *Huffman* at 881-82 (citing OHIO CONST. Art. I § 16 ("[a]ll courts shall be open and every person for an injury done him in his land, goods, person, or reputation, shall have remedy by due course of law."); *In re Whirlpool, supra,* 684 F.Supp.2d at 949–950 (citing *Chemtrol Adhesives, Inc. v. Am. Mfrs. Mut. Ins. Co.,* 42 Ohio St.3d 40, 45, 537 N.E.2d 624 (1989), *LaPuma, supra,* at 716; and *Midwest Ford, Inc. v. C.T. Taylor Co.,* 118 Ohio App.3d 798, 694 N.E.2d 114, 116–17 (1997))).

Thus, the *Huffman* Court held that although a Plaintiff cannot recover on both an OPLA claim and a common claim under the same set of facts, the Plaintiff has a procedural right to

assert common-law and OPLA claims simultaneously under Federal Rules of Civil Procedure 8(d)(2), (3), which explicitly allow parties to assert inconsistent alternative theories.[2]

This Court agrees with and follows the rationale in *Huffman*. Accordingly, this Court holds that Plaintiffs are permitted to argue in the alternative, and bring their OPLA claims for compensatory damages, and their common implied warranty claim for purely economic damages, under the same set of facts. Defendants' motion for summary judgment as to Count IV is hereby **DENIED**.

### 3. Count III: Products Liability Claim against BMW AG, Existence of a Defect

As a manufacturer, BMW AG is subject to liability under OPLA if Plaintiffs establish, by a preponderance of evidence, that the vehicle in question:

> was defective in manufacture or construction as described in section 2307.74 of the Revised Code, was defective in design or formulation as described in section 2307.75 of the Revised Code, was defective due to inadequate warning or instruction as described in section 2307.76 of the Revised Code, or was defective because it did not conform to a representation made by its manufacturer as described in section 2307.77 of the Revised Code.

Ohio Rev. Code § 2307.73(A). To survive summary judgment in an action brought under OPLA, Plaintiffs must prove: "(1) the existence of a defect in the product at issue, (2) that the defect existed at the time the product left the hands of the manufacturer, and (3) the defect was the direct and proximate cause of the plaintiff's injury." *Jones v. Staubli Motor Sports Div. of Staubli Am. Corp.*, 897 F. Supp. 2d 599, 612 (S.D. Ohio 2012).

Plaintiffs allege that BMW AG is liable under OPLA for: (1) a design defect in the vehicle which allegedly caused the fire; (2) a manufacturing defect in the vehicle that allegedly

---

Rule 8(d)(2) states, "A party may set out 2 or more statements of a claim or defense alternatively or hypothetically, either in a single count or defense or in separate ones. If a party makes alternative statements, the pleading is sufficient if any one of them is sufficient."

caused the fire; and (3) failure to warn of the purported fire risk.  Defendants contend that

Plaintiffs cannot establish any of the elements of the relevant standards for any of the product

liability claims that Plaintiffs bring under OPLA. In addition, Defendants contend that the record

shows that Plaintiffs have only pursued the design defect theory in the case, so they only address

this product liability theory in their Motion for Summary Judgment.

 The Court agrees that Plaintiffs do no develop the manufacturing defect theory or the

failure to warn theory anywhere in the record. In addition, in their reply brief, Plaintiffs do not

address Defendants' contention that Plaintiffs have failed to pursue a manufacturing defect

theory or failure to warn theory. (Doc. 81). As such, the Court will address only Plaintiffs'

design defect theory, and assume Plaintiffs have discarded other theories to establish product

liability.

### *a. Design Defect*

Under Ohio Law, a product is defective in design "if, at the time it left the control of its

manufacturer, the foreseeable risks associated with its design or formulation ... exceeded the

benefits associated with that design or formulation." O.R.C. § 2307.75(A). According to

Subsection B of § 2370.75, "[t]he foreseeable risks associated with the design or formulation of a

product shall be determined by considering factors including, but not limited to, the following:

> (1) The nature and magnitude of the risks of harm associated with that design or
> formulation in light of the intended and reasonably foreseeable uses,
> modifications, or alterations of the product;
> (2) The likely awareness of product users, whether based on warnings, general
> knowledge, or otherwise, of those risks of harm;
> (3) The likelihood that that design or formulation would cause harm in light of the
> intended and reasonably foreseeable uses, modifications, or alterations of the
> product;
> (4) The extent to which that design or formulation conformed to any applicable
> public or private product standard that was in effect when the product left the
> control of its manufacturer;

(5) The extent to which that design or formulation is more dangerous than a reasonably prudent consumer would expect when used in an intended or reasonably foreseeable manner.

O.R.C. § 2307.75(B). "Foreseeable risk" means:

a risk of harm that satisfies both of the following:
(a) It is associated with an intended or reasonably foreseeable use, modification, or alteration of a product in question.
(b) It is a risk that the manufacturer in question should recognize while exercising both of the following:
(i) The attention, perception, memory, knowledge, and intelligence that a reasonable manufacturer should possess;
(ii) Any superior attention, perception, memory, knowledge, or intelligence that the manufacturer in question possesses.

O.R.C. § 2307.71(A)(6). Section 2307.75(C) has a non-exclusive list of factors that must be considered in determining the benefits of a design:

(1) The intended or actual utility of the product, including any performance or safety advantages associated with that design or formulation;
(2) The technical and economic feasibility, when the product left the control of its manufacturer, of using an alternative design or formulation;
(3) The nature and magnitude of any foreseeable risks associated with an alternative design or formulation.

O.R.C. § 2307.75(D).

"If the plaintiff fails to demonstrate a material issue of fact whether the foreseeable risks of a design outweigh the benefits of a design, the defendant will be entitled to summary judgment on a defective design claim." *Butts v. OMG, Inc.,* No. 1:11-CV-918, 2014 WL 4628496, at *9 (S.D. Ohio Sept. 11, 2014) (citing *Monroe v. Novartis Pharm. Corp.,* Case No. 1:12–cv–00746 (WOB–KLL), 2014 WL 3378345, at *7 (S.D.Ohio July 10, 2014)).

BMW AG argues that summary judgment is appropriate on Plaintiffs' defective design claim because: (1) Plaintiffs cannot maintain their claim without expert testimony; (2) the

purported scenario speculated by Clarke that led to the vehicle fire does not satisfy the definition of foreseeable risk; (3) the foreseeable risk in the vehicles design that Clarke alleges exists does not exceed the benefits of the vehicle's design; and (4) Plaintiffs do not present a technically feasible alternative design.

### i. Expert Testimony

Defendants' argue that Plaintiffs cannot prove the necessary elements of a design defect claim under OPLA because the testimony of Richard A. Clarke, Plaintiffs' proposed expert witness, should be excluded under Fed. Evid. R. 702. Without an expert to establish the elements of the claim, Defendants argue, the design defect claim fails as a matter of law. This Court has already denied Defendants Motion in Limine to Exclude the Testimony of Richard Clarke. (Doc. 77). As such, Defendants' argument fails.

### ii. Foreseeable Risk Analysis

Defendants argue that the record does not establish that a foreseeable risk of fire existed in the vehicle as designed. As an initial point of clarification, Plaintiffs stated in their briefs, and reiterated at oral argument, that Mr. Clarke's opinion is not that the presence of openings in the BMW is the defect. Rather, the defect in the vehicle is that debris was naturally permitted to accumulate in the engine compartment in close proximity to heated surfaces due to the design of the stiffener plate, which lacks any holes to permit self-cleaning, and which has six protruding bolts that trap debris. While Mr. Clarke opines that debris entered via openings in the hood and through the NACA ducts, Plaintiffs submit that this opinion is material only to contest the Defendants' theory that debris entered due to a nesting rodent, and could not have entered due to the normal aerodynamics of the vehicle.

Defendants respond, however, that before reaching the question of whether a foreseeable risk of fire exists in the stiffener plate as designed, it is Plaintiffs' burden to show, first, that BMW AG should have recognized the risk that debris can enter the engine department and settle on the stiffener plate, through openings around hood or otherwise, during normal vehicle use. Plaintiffs have not met this burden, Defendants argue, as they have not presented any proof that debris can infiltrate the vehicle via openings in the hood or NACA duct, but their expert, Clarke, only opines that it is possible. In addition, Defendants will present two primary pieces of evidence showing a debris fire on the stiffener plate was not foreseeable. First, between 2004 and 2012, BMW sold 1.8 million vehicles on the E90 platform, and the record does not show any other fires in similar vehicles attributable to the alleged defect. Second, BMW performed extensive aerodynamic testing on the vehicle, none of which revealed the possibility of debris entering the engine compartment during the normal course of vehicle operation.

In addition, Defendants argue that not a single factor used to determine foreseeable risk under § 2307.75(B) applies to the case *sub judice*. In terms of the first factor, Defendants will present evidence that it performed extensive testing at the design stage showing that debris of the kind that started the fire could not infiltrate the engine compartment via openings in the hood or accumulate in the vehicle's engine compartment. (Doc. 78-3, Keefer Deposition). While Clarke opines that debris can enter via openings in the hood and the NACA ducts based on his inspection of the vehicle and two exemplars, he never tests this theory. As to the second and fifth factors, Defendants argue that they had no duty to warn of an unknown or unknowable risk, and that the vehicle is no more or less dangerous than a reasonable consumer would expect, because there is no design defect. As to factor three, Defendants assert that there is no likelihood that the vehicle design would cause the type of harm at issue because it is impossible for debris to

36

infiltrate the vehicle in the manner Plaintiffs propose, and Clarke has not presented any evidence that it is possible.

Plaintiffs counter that the collective testimony of all three of its experts establishes the prima facie case that the BMW was defective at the time the BMW left possession of the Defendants. In addition, Plaintiffs will cite to Defendants' expert Richard Slaba's deposition testimony to raise a genuine issue of material fact as to Defendants' contention that no other all-wheel drive E90 platform vehicle has caught fire due to a similar defect. In Slaba's deposition he states that only 220,000 of the purported 1.8 million E-90 vehicles sold between 2004-2012 were all-wheel drive vehicles equipped with the stiffener plate. Further, Mr. Slaba has held his position in the BMW Product Analysis Department only since 2011, and during that time period he has become aware of 20-30 fires in BMW E-90 vehicles. Plaintiffs argue that many of those fires are unexplained, and could have been caused by the stiffener plate defect; thus, Slaba's assertion that no such fire has ever occurred lacks proper foundation and is speculative. Further, they will cite to Keaton, Defendants' expert, who stated in his deposition that deductive reasoning indicated to him that debris drawn into the vehicle through any openings will be forced down to the bottom portion of the vehicle, where the stiffener plate is located. (Doc. 81-7 at 74-84).

The Court will begin the foreseeable risk analysis by addressing Plaintiffs' contention that Defendants' focus on the foreseeable risk is misplaced, and ignores that Plaintiffs can successfully pursue a design defect claim under the consumer expectation test alone. Before the 2005 amendments, Ohio law provided Plaintiffs "with two theories upon which to recover: (1) the consumer expectation standard; and (2) the risk-benefit standard." *Acton v. Excel Indus., Inc.*, No. 2:08-CV-315, 2009 WL 1794559, at *4 (S.D. Ohio June 23, 2009). In 2005, however, an

amendment to OPLA removed the consumer expectation test as an independent theory of liability and made, "the extent to which the design or formulation is more dangerous than a reasonably prudent consumer would expect when used in an intended or reasonably foreseeable manner," one of five factors to use when determining whether a foreseeable risk exists. *See* O.R.C. § 2307.71 (B)(5); *See Ruff v. Wal-Mart Stores E., LP,* No. 2:07CV292, 2009 WL 3150319, at *4 (S.D. Ohio Sept. 30, 2009) (Senate Bill 80, effective April 7, 2005, modified OPLA by removing the "consumer expectation" standard from R.C. § 2307(A)(2) to appear instead as a new subsection of § 2307.75(B)(5)). The question for this Court is whether proving the consumer expectation test, as it existed prior to the 2005 amendments, is sufficient alone to prove foreseeable risk under the current version of OPLA.

Plaintiffs do not present any cases that state definitively that under OPLA amendments, a Plaintiff can still pursue either a foreseeable risk analysis or a consumer expectation analysis in order to satisfy their burden of proving foreseeable risk under OPLA, § 2307.75 (B). Plaintiffs do cite, however, to *Krumpelbeck v. Breg, Inc.,* 491 F. App'x 713 (6th Cir. 2012), a case which shows that the consumer expectation test remains a necessary consideration for imposing liability in design defect cases after the 2005 OPLA Amendment.

In that case, the district court had concluded that plaintiff's design defect claim failed because there was no evidence that the defendant had a reason to know of the purported risk associated with product. *Id*. The appellate court found that the district court had erred in its foreseeable risk analysis under OPLA because it had completely ignored the consumer expectation test—the "primary basis" on which plaintiff argued the product was defectively designed. *Id*. The appellate court explained that the consumer expectation test focuses "not on the risks known to the manufacturer but *the consumer's understanding and appreciation of the*

*dangers associated with use of the product*;" thus, focusing on the foreseeability of the risk from

the manufacturer's perspective alone was insufficient under §2307.75(B). *Id*. The appellate court

then held that:

> [b]ecause the district court did not discuss the statutory factors listed in §
> 2307.75(B), including the consumer-expectation test, we find that it misapplied
> the law in determining the 'foreseeable risks' for the purposes of Krumpelbeck's
> claim for defective design.

*Id.*

Defendants argue that *Krumpelbeck's* holding weighs in their favor because it shows that

the consumer protection test is only one of five factors in the foreseeability test. This Court

agrees that *Krumpelbeck* shows that under the newer version of OPLA, the consumer expectation

test is no longer a completely independent test in the same way it was under the prior version of

OPLA. Instead, the *Krumpelbeck* court makes clear that the consumer expectation test is one of

five nonexclusive considerations that the court should discuss when determining foreseeable risk.

That being said, the appellate court in *Krumpelbeck* acknowledged that the consumer expectation

test was plaintiff's "primary basis" for arguing that foreseeable risk existed, and still went on to

hold that the district court erred in its foreseeable risk analysis by failing to consider the

consumer expectation test. This suggests that a genuine issue of material fact concerning the

consumer expectation test is enough for the determination of foreseeable risk to go to the jury.

Further, § 2307.75(B) makes clear that "[t]he foreseeable risks associated with the design

or formulation of a product shall be determined by considering factors including, but not limited

to" the five factors listed in the statute. Thus, while OPLA directs Courts to consider the five

factors, it contains no directive in how to weigh these factors. Accordingly, the holding in

*Krumpelbeck* and the language of OPLA are both consistent with this Court's holding that each

factor under § 2307.75(B) must be considered, and that as long as a genuine issue of material

fact exists as to any nonexclusive factor, the Court should find that whether a foreseeable risk

exists is a question for the jury. While a jury should properly be instructed to consider all nonexclusive factors when determining the existence of foreseeable risk, the ultimate weighing of those factors in determining foreseeable risk is a task for the jury, not the Court.

This Court's holding is consistent with the Ohio rule that "the question of what an ordinary consumer expects in terms of the risks posed by the product is generally one for the trier of fact." *Donegal Mut. Ins. v. White Consol. Indus., Inc.*, 2006-Ohio-1586, ¶ 16. It is further consistent with the broader rule that summary judgment will rarely be granted in design-defect claims because questions of "[f]oreseeable uses of a product, foreseeable risks associated with a product, benefits associated with a product, and consumer expectations regarding a product's uses and risks are ordinarily all factual questions." *McWilliams v. S.E. Inc.*, No. 5:07CV3700, 2009 WL 3625173, at *3 (N.D. Ohio Oct. 29, 2009) (citing *Welch Sand & Gravel, Inc. v. O & K Trojan, Inc.,* 107 Ohio App.3d 218, 225, 668 N.E.2d 529 (1995)).

Because questions of foreseeable risk and benefits associated with a product are generally reserved for the jury, this Court declines to follow the rationale in *Butts v. OMG, Inc.*, No. 1:11-CV-918, 2014 WL 4628496, at *8-12 (S.D. Ohio Sept. 11, 2014), a case in which the Court, not the jury, weighed the five § 2307.75(B) foreseeable risk factors, and did not consider *Krumpelbeck*. In *Butts*, Plaintiffs argued that a caulking gun used to adhere insulation board to roofing substrates was defective as designed because it did not have proper safety mechanisms to protect users from getting their fingers caught in it should a blowback effect occur. Defendants argued that Plaintiff had not adduced sufficient facts showing risks of the product design outweighed its benefits, because, like the Plaintiffs in *Krumpelbeck*, they only addressed the consumer expectation factor of 2307.75(B), and had foregone any analysis of the other factors set out in §§ 2307.75(B) and (C).

The *Butts* court agreed that the consumer expectation test favored the Plaintiff, noting that a reasonably prudent consumer could not expect to suffer a crushing hand injury during the normal use of the product. *Id*. at *10. Although the consumer expectation factor favored the Plaintiff, however, the *Butts* court found that the "remaining factors in Subsections B and C either favor[d] Defendants, [were] neutral, or [had] no applicability." *Id*. In other words, according to the Court in *Butts*, reliance on the consumer expectation test alone did not meet the § 2307.75(B) standard for establishing a genuine issue of material fact as to foreseeable risk under the facts of that case. After analyzing why each of the remaining factors weighed in favor of the Plaintiffs, the *Butts* Court ultimately granted summary judgment to Defendant because "the balance of the § 2307.75(B) factors indicate[d] that there was not a foreseeable risk of a blowback event with the design of the SpotShot Applicator and OlyBond 500 at the time of Plaintiff's accident." *Id*.

This Court disagrees with *Butt's* that the Court's proper role is to weigh the nonexclusive foreseeable risk factors under § 2307.75(B) on summary judgment. Although the consumer expectation test is no longer an independent test, neither *Krumpelbeck* nor the language of § 2307.75(B) indicates that the Court's role is to weigh the foreseeable risk factors. As stated above, unless no genuine issue of material fact exists as to any factor under § 2307.75(B)— which would be rare considering the fact-intensive nature of the factors and a design defect claim—summary judgment on the basis of failure to prove foreseeable risk will generally be inappropriate.

In light of this Court's interpretation of *Krumpelbeck* and § 2307.75(B), this Court will address each nonexclusive factor to determine whether genuine issues of material fact exist. As to (B)(1), and (B)(3)—"the nature and magnitude of the risks of harm associated with that

41

design," and the "likelihood that that design or formulation would cause harm" in light of the intended and reasonably foreseeable uses of the product—this Court finds that there are genuine issues of material fact precluding summary judgment. While Defendants will present evidence suggesting that no similar debris fires on the stiffener plate have ever occurred in 1.8 million E90 platform BMWs, Plaintiffs will present evidence undermining the foundation and credibility of such evidence including: Slaba's testimony that only 220,000 of the purported 1.8 million E90 vehicles sold between 2004-2012 were all-wheel drive vehicles equipped with the stiffener plate, and that since Slaba began at BMW in 2011, he has become aware of 20-30 fires in BMW E90 vehicles, many of which are unexplained. In addition, genuine issues of material fact exist as to the likelihood that debris can enter the engine compartment during the normal use of the vehicle, thus leading to a fire on the stiffener plate. While Defendants will present evidence the debris accumulation on the stiffener only could have been caused by a rodent, Plaintiffs will present expert testimony that debris can enter the engine compartment and rest on the stiffener plate during normal use of the vehicle. The weight and credibility of such evidence is not for this Court to determine. As such, the likelihood that the stiffener plate would cause a fire, and the magnitude of the risk of fire, both present genuine issues of material fact.

Factor (B)(2)—the likely awareness of product users, whether based on warnings, general knowledge, or otherwise, of those risks of harm—is not applicable in this case. The record shows that the Patricks used and operated their vehicle normally, and no adjustment in their use of the vehicle would have prevented the vehicle fire in this case either under Plaintiffs' or Defendants' theory of causation. As such, no change in awareness or warning related to the risk of fire would have modified the Patrick's behavior in this case, short of warning them not to use the vehicle at all.

Factor (B)(4)—the extent to which the design of the stiffener plate conformed to any applicable public or private product standard that was in effect when the vehicle left the control of BMW AB—also presents a genuine issue of material fact. Defendants argue that Plaintiffs present no evidence showing that the holes in the stiffener plates of the two-wheel drive BMW were intended to be used for self-cleaning. Plaintiffs respond that other stiffener plates on the market when the vehicle was designed, including those on the two-wheel drive E90 BMWs, used the allegedly safer, "self-cleaning" design, and that this design would have avoided the fire. This Court acknowledges that outside of showing other vehicles with the "self-cleaning" stiffener plate, Plaintiffs do not present any other evidence regarding vehicle standards as they relate to debris collection in the engine compartment and stiffener plate design. It is not for the Court to weigh the persuasive value of Plaintiffs' evidence, however, but only to find that it is a material fact for the jury.

Finally, as to (B)(5)—the extent to which the design or formulation of the stiffener plate is more dangerous than a reasonably prudent consumer would expect when used in an intended or reasonably foreseeable manner—also presents a genuine issue of material fact. Plaintiffs argue that a prudent consumer would not expect her properly maintained car to catch on fire during normal use due to the normal accumulation of debris in the engine compartment. Defendants contend that this factor is not significant because the situation which allegedly led to the fire—a rodent nesting in the engine compartment—is not a foreseeable occurrence, and thus beyond the control of the manufacturer. While the jury may ultimately find that other foreseeable risk factors weigh against relying on the consumer expectation test to establish foreseeable risk, this balancing is left to the trier of fact.

In sum, genuine issues of material fact exist as to the foreseeable risks associated with the design or formulation of the stiffener plate.

### iii. Risk/Benefit Analysis

Next, Defendants argue that even if Plaintiffs can show a "foreseeable risk" existed in the vehicle, no reasonable juror could find that the foreseeable risks associated with the vehicle's design exceeded the benefits associated with that design. A non-exclusive list of factors to consider when determining the benefits of the stiffener plate as designed includes: "the product's utility, including performance or safety advantages; the technical and economic feasibility of using an alternative design; and the nature and magnitude of any foreseeable risks associated with an alternative design." *Clay v. Ford Motor Co.,* 215 F.3d 663, 670 (6th Cir. 2000) (citing Ohio Rev.Code Ann. § 2307.75(C)).

Slaba's Deposition puts forth the benefits of the stiffener plate as designed, including that it: (1) strengthens the vehicle's front axle; (2) reduces drag by guiding airflow underneath the vehicle, playing a significant role in the vehicle's aerodynamic characteristics and reducing fuel consumption; (3) reduces vehicle emissions by allowing catalytic converters to reach operating temperatures more quickly; (4) allows the car to retain heat during breaks in operation so it can heat the passenger compartment more quickly; (5) shields the engine from fluid, spray, and grime; and (6) reduces noise emissions. Defendants argue that Plaintiffs' alternative design— placing holes in the stiffener plate—would reduce these benefits, although it is unclear from the record by how much. In sum, Defendants argue that no reasonable juror could find such a miniscule risk of fire—one out of 1.8 million vehicles, or even 220,000 vehicles on Plaintiffs' count—outweighs these substantial benefits in fuel economy and aerodynamics.

When assessing all three factors under § 2307.75(C), genuine issues of material fact exist regarding the benefits of the stiffener plate as designed. As to the first factor, Defendants argue that the stiffener plate as designed clearly has performance advantages, but they do not present any evidence of safety advantages. Plaintiffs respond, and Clarke states in his expert report, that the risk of fire presented by a stiffener plate without holes clearly outweighs any performance gains derived from it. As such, although Plaintiffs do not present any opinion or evidence as to how his alternative design will affect some performance advantages, it is for the jury to balance the design versus safety advantages of the alternative design.

As to factors two and three, Plaintiffs presented an alternative design, which is a stiffener plate with holes to allow self-cleaning. Plaintiffs contend that this alternative design would have remedied the engine fire, regardless of how debris entered the area of the stiffener plate in the first place. Although Clarke admits in his deposition that his alternative stiffener plate is "primitive," and would require an engineer's touch to reach full implementation, Clarke manufactured it as a conceptual example. Clarke also presents evidence, which is not controverted, that the newer version of the subject vehicle, the F-30 platform, has stiffener plates with holes. The shortcoming of Clarke's alternative design is that he presents no testing or evidence that his design would have remedied a similar fire, or that the newer version of the stiffener plate with holes, currently in use by BMW, was intended to promote self-cleaning or actually does. Neither does Clarke present research concerning stiffener plate design.

This Court agrees with Plaintiffs, however, that weighing the foreseeable risks of the stiffener plate against the benefits of the stiffener plate as designed is a factual issue for the jury, precluding summary judgment. *Clay* at 671 (holding that as reasonable minds could differ about a risk versus benefits analysis in a vehicle's design, the issue should go to the jury). As such,

45

whether the benefits of the stiffener plate as designed outweighs any foreseeable risks presents a genuine issue of material fact.

### iv. Alternative Design Analysis

Pre-2005 Amendments to OPLA, the law was clear that it was the plaintiff's burden to prove that a practical and technically feasible alternative design existed that would have prevented the harm for which the claimant seeks to recover without substantially impairing the usefulness or intended purpose of the product. *Gist v. GMC*, 2005 U.S. App. LEXIS 6443 (6th Cir. Apr. 12, 2005). Post-2005 Amendments, OPLA states that a product is "*not* defective in design" if there was no "practical and technically feasible alternative design ... that would have prevented the harm for which the claimant seeks to recover … without substantially impairing the usefulness or intended purpose of the product." Ohio Rev.Code § 2307.75(F) (emphasis added). "Although this subsection does not state that it is a plaintiff's burden to prove an alternative design, the Sixth Circuit has so held." *Monroe v. Novartis Pharm. Corp.*, No. 1:12-CV-00746 WOB, 2014 WL 3378345, at *7 (S.D. Ohio July 10, 2014) (relying on *McGrath v. Gen. Motors Corp.,* 26 Fed.Appx. 506, 510 (6th Cir.2002) ("[Plaintiff]'s argument that he is not required to provide such evidence is therefore without merit."); *Jacobs v. E.I. du Pont de Nemours & Co.,* 67 F.3d 1219, 1242 (6th Cir.1995)." Defendants argue that while Plaintiffs have offered an alternative design—specifically a stiffener plate with holes that Clarke produced—Plaintiffs have not offered a practical and technically feasible alternative design because: (1) Clarke performed no testing on his design to show it was feasible; and (2) Clarke's design diminishes some benefits of the stiffener plate and ignores others.

As noted above, newer models of the subject vehicle have stiffener plates with holes. Defendants argue that the newer vehicle is a total redesign, however, and, as such, Plaintiffs

cannot show how a stiffener plate with holes would affect the feasibility of the E90 BMW. On the other hand, even if the Court were to accept that the alternative version of the stiffener plate will diminish all of the benefits of the current stiffener plate, those benefits have little to do with the central purpose of a vehicle: to transport people safely from place to place. Plaintiffs argue that the stiffener plate with holes prevents a serious safety hazard, and a reasonable juror could agree that the stiffener plate with holes does not substantially impair the usefulness or intended purpose of the vehicle. This is so even without evidence of testing showing exactly how the alternative design diminishes the performance benefits of the stiffener plate. As Plaintiffs have presented an alternative design, it is a question for the jury whether such a design is practical, technically feasible, and substantially impairs the usefulness or intended purpose of the vehicle.

In sum, genuine issues of material fact exist regarding whether the vehicle was defective in design due to the position and design of the stiffener plate. Thus, Defendants' Motion for Summary Judgment as to Count III is hereby **DENIED**.

### *4. Count II: Product Liability Claim against BMW NA*

Under OPLA, a "supplier" can be held liable for a design defect either directly under O.R.C. section 2307.78(A), or indirectly, under O.R.C. section 2307.78(B). Where, as here, Plaintiffs claim that the supplier, BMW NA, is indirectly liable, Plaintiffs must show that: (1) the manufacturer, BMW AG, is liable under O.R.C. Sections 2307.71-77, and; (2) one of the eight conditions of derivative liability under O.R.C. § 2307.78(B) applies to BMW NA. This Court already determined in Section (III)(C)(3) *supra* that genuine issues of material fact preclude summary judgment on Plaintiffs' product liability claims against the manufacturer, BMW AG. Thus, under the first prong of the derivative liability analysis, summary judgment is not proper on Plaintiff's product liability claim against the supplier, BMW NA.

As to the second prong of the derivative liability analysis, Plaintiffs concede that the only potentially applicable provision for derivative liability that applies to BMW NA is that "the supplier in question is owned or, when it supplied that product, was owned, in whole or in part, by the manufacturer of that product." O.R.C. § 2307.78(B)(4). In their briefs, Defendants argued that Defendant BMW NA should be dismissed because Plaintiffs cannot make a showing that (B)(4) applies to BMW NA. At the time of their motion, only two witnesses with knowledge concerning the corporate structure of BMW AG or BMW NA have testified, Mark Yeldham and Thomas Slaba, and neither testified that BMW NA has ever owned BMW AG or vice versa. Plaintiffs had otherwise not adduced evidence creating a genuine issue of material fact concerning BMW AG's ownership of BMW NA.

During oral argument on this Motion, however, the Court confirmed that Defendants had failed to file a corporate disclosure statement at the time of filing their first response to Plaintiffs' Complaint, as required by Fed. R. Civ. P. 7.1. Accordingly, Defendants filed their Rule 7.1 Defendant BMW NA's Corporate Disclosure Statement immediately after oral argument. (Doc. 98). In the document, BMW states that it "is an indirect, wholly owned subsidiary of Bayerishche Motoren Werke AG. No single publicly held corporation owns 10% or more of BMW NA's outstanding shares." Accordingly, O.R.C. § 2307.78(B)(4) applies to BMW AG because the supplier, BMW NA, is owned in whole by the manufacturer of the vehicle, BMW AG. Thus, BMW NA meets the second prong of derivative liability analysis by showing that one factor under § 2307.78(B)(4) applies.

Thus, as a genuine issue of material fact exists as to the first prong of the derivative liability analysis, and Plaintiffs have shown that the second prong of the analysis is satisfied,

48

Defendants' Motion for Summary Judgment as to Count II, product liability against BMW NA, is hereby **DENIED.**

### IV. CONCLUSION

In Conclusion, Defendants' Motion for Summary Judgment as to Counts II, III, and IV in the Plaintiffs' Complaint is hereby **DENIED** in full.

**IT IS SO ORDERED.**

_____/s/ Algenon L. Marbley_____
**ALGENON L. MARBLEY**
**UNITED STATES DISTRICT JUDGE**

**DATED: February 4, 2015**