**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**

| | | |
|---|---|---|
| GREAT NORTHERN INSURANCE COMPANY, et al., | ) ) | Case No.:  2:11CV1153 |
| | ) | |
| Plaintiffs, | ) | JUDGE MARBLEY |
| | ) | |
| vs. | ) | |
| | ) | **DEFENDANTS' MOTION FOR** |
| BMW OF NORTH AMERICA LLC, et al., | ) | **JUDGMENT AS A MATTER OF LAW** |
| | ) | |
| Defendants. | ) | |
| | ) | |

Now come Defendants, and hereby renew their request for this Court to Grant their Motion for Judgment as a Matter of Law pursuant to Rule 50 of the Federal Rules of Civil Procedure.  Even when viewing the evidence in the light most favorable to the non-moving party, in this case the Plaintiffs, no reasonable juror could conclude that Plaintiffs have met their burden of proof for either claims of Defective Design or Breach of Implied Warranty of Merchantability.  Thus, Defendants request this Court to Grant their Motion for Judgment as a Matter of Law and dismiss all of Plaintiffs' claims with prejudice.  Memorandum in support of Defendants' Renewed Motion for Judgment as a Matter of Law is attached.

Respectfully submitted,

/s/ Lawrence A. Sutter
Lawrence A. Sutter (0042664)
John R. Conley (0084079)
Sutter O'Connell
3600 Erieview Tower
1301 east 9th Street
Cleveland, Ohio 44114
Phone: (216) 928-2200
Fax: (216) 928-4400
lsutter@sutter-law.com
jconley@sutter-law.com
*Attorneys for Defendants, BMW of North America, LLC and Bayerische Motoren Werke AG*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**

GREAT NORTHERN INSURANCE COMPANY, )    Case No.:  2:11CV1153
et al., )
                                         )    JUDGE MARBLEY
                  Plaintiffs, )
                                         )
vs. )
                                         )    **MEMORANDUM IN SUPPORT OF**
BMW OF NORTH AMERICA LLC, et al., )    **DEFENDANTS' MOTION FOR**
                                         )    **JUDGMENT AS A MATTER OF LAW**
                  Defendants. )
                                         )

## I.    INTRODUCTION

This case involves a fire that started in a 2007 BMW 328xi (the "Vehicle") and resulted in substantial damage to the Vehicle and the insureds' residence.  Plaintiffs Great Northern Insurance Company and Pacific Indemnity Insurance (collectively "Plaintiffs") reimbursed the insured under their automobile insurance and homeowners' insurance policies.  Plaintiffs then field a subrogation lawsuit against defendants BMW of North America LLC ("BMW NA") and Bayerische Motoren Werke AG ("BMW AG" and collectively with "BMW NA" the "Defendants") asserting one claim for breach of implied warranty and two separate product liability claims (one against each Defendant) under the Ohio Products Liability Act ("OPLA").

Defendants' filed a Motion for Summary Judgment with this Court on May 30, 2014 and were denied.  The case proceeded to trial and on July 2, 2015, after the conclusion of Plaintiffs' case-in-chief, Defendants' made an oral motion for a Directed Verdict, Judgment as a Matter of Law, pursuant to Fed. R. Civ. Pro. 50(a).  Defendants' Motion was again denied.  Defendants' now renew their Motion for Judgment as a Matter of Law, pursuant to Fed. R. Civ. Pro. 50(a), and request this Court to dismiss all of Plaintiffs' claims.

## II.     LAW AND ARGUMENT

### a. Fed. R. Civ. Pro. 50(a) Provides the Standard for Granting a Motion for Judgment as a Matter of Law.

The inquiry for resolving a motion for judgment as a matter of law pursuant to Rule 50 is the same as the inquiry for resolving a motion for summary judgment pursuant to Rule 56. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150, 147 L. Ed. 2d 105, 120 S. Ct. 2097 (2000). Courts review all of the evidence in the record in the light most favorable to the nonmoving party and determine whether there was a genuine issue of material fact for the jury. *Gray v. Toshiba Am. Consumer Prods., Inc.*, 263 F.3d 595, 598 (6th Cir. 2001). Rule 50(a) states:

> (1) In General.  If a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue, the court may:
> (A)  resolve the issue against the party; and
> (B)  grant a motion for judgment as a matter of law against the party on a claim or defense that, under the controlling law, can be maintained or defeated only with a favorable finding on that issue.
> (2) Motion.  A motion for judgment as a matter of law may be made at any time before the case is submitted to the jury. The motion must specify the judgment sought and the law and facts that entitle the movant to the judgment.

"That is, the court should give credence to the evidence favoring the nonmovant as well as that 'evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses.'" *Reeves,* 530 U.S. at 150, quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250-51, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986).

### b. No Reasonable Juror Could Find that the 2007 BMW 328xi was Defectively Designed Under §§2307.75 of the Ohio Products Liability Act.

Plaintiffs' primary claim in this matter is that BMW's stiffener plate was defectively designed and ultimately caused the fire in Mrs. Patrick's vehicle.  To prove defective design

under Ohio Product Liability Act, O.R.C. §§2307.75[1], Plaintiffs were required to present evidence on two essential elements: (1) the foreseeable risks associated with the plate's current design exceed its benefits; and (2) at the time of the plate's manufacture, there was a technically feasible alternative design that would have prevented the damage to Plaintiffs' property without impairing the plate's usefulness or intended purpose. §§2307.75(F).  Under Ohio case law, Plaintiffs' bear the burden of production. *Jacobs v. E.I. du Pont de Nemours & Co.*, 67 F.3d 1219, 1242 (6th Cir. 1995).  To meet this burden, Plaintiffs' were required to provide expert testimony regarding the risks and benefits of both BMW's stiffener plate and their proposed reasonable alternative design. See *Lawrence v. Raymond Corp.*, No. 3:09 CV 1067, 2011 U.S. Dist. LEXIS 85798 at *25 (N.D. Ohio Aug. 4, 2011).

In *McGrath v. GMC*, 26 Fed. Appx. 506 (6th Cir. 2002)[2], Plaintiff, executor of decedent's estate, brought a state-law strict-liability action in tort against defendant car manufacturer, claiming that the car in which decedent was riding was defectively designed in its side impact system. *Id.* at 508.  The United States District Court for the Northern District of Ohio granted the manufacturer's motion for summary judgment because, in part, Plaintiff failed to present evidence of a feasible alternative design. *Id.*

In affirming the Northern District's decision, the 6th Circuit first analyzed Ohio's statute and case history to establish that it was Plaintiff's burden to present evidence of a reasonably feasible alternative, stating: "McGrath's argument that he is not required to provide such evidence is therefore without merit". *Id.* 510.  The Court then held, "McGrath has offered no evidence of testing that would establish an alternative available to GM when the LeSabre left its

---

[1] Subsection (F) of O.R.C. § 2307.75 reads:(F) A product is not defective in design or formulation if, at the time the product left the control of its manufacturer, a practical and technically feasible alternative design or formulation was not available that would have prevented the harm for which the claimant seeks to recover compensatory damages without substantially impairing the usefulness or intended purpose of the product, unless the manufacturer acted unreasonably in introducing the product into trade or commerce.

[2] Notice: NOT RECOMMENDED FOR FULL-TEXT PUBLICATION. SIXTH CIRCUIT RULE 28(g) LIMITS CITATION TO SPECIFIC SITUATIONS. PLEASE SEE RULE 28(g) BEFORE CITING IN A PROCEEDING IN A COURT IN THE SIXTH CIRCUIT. IF CITED, A COPY MUST BE SERVED ON OTHER PARTIES AND THE COURT. THIS NOTICE IS TO BE PROMINENTLY DISPLAYED IF THIS DECISION IS REPRODUCED. *McGrath v. GMC*, 26 F.App'x 506, 507 (6th Cir.2002)

possession in 1987. Since McGrath failed to present proof that a feasible alternative design for the LeSabre's side impact structure existed when the LeSabre left GM's control, under O.R.C. § 2307.75, McGrath has failed to make his case, and summary judgment was properly granted." *Id. 511.*

The case most synonymous with this present matter is, *Mercurio v. Nissan Corp.*, No. 3:97 CV 7067 (N.D. Ohio Feb. 4, 2000). Although sealed by the Northern District of Ohio, *Mercurio* is cited to extensively in *Mcgrath, supra.* In *Mercurio,* plaintiff claimed that a 1993 Nissan Altima was defectively designed because the driver's side floor pan reinforcement member buckled upward into the occupant space. *Mcgrath* at 511, citing to *Mecurio* at 2, 4. The plaintiff attempted to show that alternative designs created for the floor pan design found in a Volvo 850 established that an alternative design was available. *Mcgrath* at 511, citing to *Mecurio* at 4. The court stated:

> Although the design Plaintiff proposes undoubtedly has been tested in some contexts -- it exists in the Volvo 850 -- there is no evidence that it has ever been tested for feasibility in a Nissan Altima. Plaintiff does not allege that her experts have done any computer modeling, prototype construction, or any other scientific research indicating that her alternative design would function in a 1993 Altima. Plaintiff does not allege that any testing has been performed to determine the possible effects her alternative design would have on the cost, styling, practicality, or overall safety of the Altima. Plaintiff does not allege that her experts have done any computer modeling or other research to determine how an Altima with her proposed alternative design would have functioned under accident conditions identical to those in the case at bar, and whether the design would have prevented Mr. Mercurio's injuries.

*Mcgrath* at 511, citing to *Mecurio* at 6.

Similarly, the 6th Circuit affirmed the decision from the Middle District of Tennessee to exclude expert testimony and reasonable alternative design in *Johnson v. Manitowoc Boom Trucks, Inc.*, 484 F.3d 426, 435 (6th Cir.2007). The District Court excluded the expert opinions and alternative design under *Daubert* analysis, finding the proposed theories and designs were never tested, peer reviewed, or generally accepted by the engineering community and were

prepared entirely in preparation for litigation[3].  *Johnson v. Manitowoc Boom Trucks, Inc.*, 406 F.Supp.2d 852, 866 (M.D.Tenn.2005). "Consideration of the context of an expert's opinion is especially important given the potential for abuse in light of the incredible benefits of hindsight. Here, the expert's opinions were conceived, executed, and invented solely in the context of this litigation. The expert here does not even offer a proposed design that would necessarily make this crane safer; he merely offers a mechanism that might have prevented a very specific accident that occurred under very specific conditions." *Johnson*, 484 F.3d 426, 435 (6th Cir.2007), quoting, *Johnson*, 406 F.Supp.2d 852, 866 (M.D.Tenn.2005).

Here, Plaintiffs' presented only one liability expert, Richard Clarke, to support their claim for defective design of the Vehicle's stiffener plate and present evidence of a feasible alternative design.  The thrust of Clarke's testimony on direct examination was that his proposed feasible alternative design encompassed "self-cleaning" properties that are not found in the Vehicle's stiffener plate.   His opinion was that BMW's design is defective because it allows for the accumulation of organic material on the stiffener plate which caused the fire at issue.  However, during cross examination, Clarke, as a disinterest party, admitted to the following:

67:27-68:2.
>    Q. But you never actually drove the vehicle with the
>    alternative design in place?
>    A. No, we didn't.

68:7-124
>    Q. I understand that. But the important question here is
>    whether you actually drove it with your part in place.
>    A. No. This would be very early in the design. You
>    would want to have one that was welded. This was designed
>    to see if it fitted. And then if it fits, the next stage
>    would be to design, build one that's welded and stronger
>    that would take the loads of driving.
>
>    Q. So the design that you have shown us is not in fact

---

[3] "Mr. Friend has never designed an interlock system for manufacture, or talked with any manufacturer about such a system. Id. at 210. Mr. Friend repeatedly refers to his proposed alternative design as a "concept" or "one concept to [apply the Asplundh interlock to the subject Manitowoc crane]." Id. at 138. Mr. Friend admits that he would "certainly" want to test his interlock system. Id. at 145-46." *Johnson v. Manitowoc Boom Trucks, Inc.*, 406 F.Supp.2d 852, 861 (M.D.Tenn.2005).

the finished product?
A. No. It's a concept.

Q. It's a concept. It is in no way, shape or form ready
to be put on a production vehicle?
A. No. You would want to determine if the holes are too
big, you could make them smaller. You don't have to have
them as open as I designed it. You just need openings to
stop debris from catching on there.

Q. So this particular design, it's never been tested?
A. No.

69:18-23

Q. We're going to talk about the new one. Don't worry
about it. My question to you is you've not done any
testing on what you claim to be a replacement part in order
to ensure the safety of the drivers and passengers of that
vehicle, have you?
A. I didn't claim it to be a replacement part.

70:3-10

Q. That's not my question. Answer my question, please.
You admit that the design as you have it and it's
currently configured is not a feasible alternative design to be put
in a vehicle?
A. As it is today?

Q. As it is today.
A. Not in its direct concept, no. It needs to be
changed.

70:20-22

Q. And your alternative has never been put into a vehicle
and tested to see where it's stiff enough, has it?
A. No. It's just a concept.

71:3-5

Q. And your concept, concept, has never been tested for
aerodynamics or airflow?
A. No.

71:25-72:11

Q. And you have done no testing or no studies whatsoever
in order to determine whether or not your concept would
have the same fuel savings or emissions savings, have you?
A. I have not.

Q. Likewise, there's been no crash testing?
A. No.

Q. No sled testing?
A. No.

Q. No testing what would have the vehicle comply with the
federal motor vehicle safety standards of the United States

|       | of America, correct? |
|-------|----------------------|
|       | A. Correct. |
| 76:2-7 | |
|       | Q. You've never designed an underbody cover for a production vehicle? |
|       | A. I have not. |
|       | |
|       | Q. You've never designed a stiffener plate for a production vehicle? |
|       | A. I have not. |
| 78:2-6 | |
|       | Q. And you certainty haven't had anything peer reviewed by your compatriots in the field, have you? |
|       | A. Of self-cleaning. |
|       | |
|       | Q. Self-cleaning? |
|       | A. No. |

*Clarke Testimony Transcript,* attached hereto as Exhibit A, pgs. 67-78[4].

Plaintiffs' failed to meet the requirements of providing a feasible alternative design under OPLA, O.R.C. §§2307.75 and requirements set forth by 6th Circuit case law.  Plaintiffs' liability expert admits that he has never designed an underbody cover or stiffener plate before, his alternative design is only a "concept", his concept is not intended to be a replacement part, it was never tested, it needs to be changed, his theory was never peer reviewed, and ultimately, it is not a reasonable alternative design. Ex. A. pgs. 67-78. In sum, no reasonable juror could conclude that Plaintiffs' have shown that foreseeable risks associated with the Vehicle's stiffener plate's current design exceed its benefits or provided an alternative design that would have prevented the damage to Plaintiffs' property without impairing the plate's usefulness or intended purpose.  Thus, Defendants' Motion for Judgment as a Matter of Law should be Granted and Plaintiffs'' claims for defective design under OPLA should be dismissed.

---

[4] The transcript of Richard Clarke's cross-examination is a "Realtime Draft Only – Not An Official Transcript."  An official transcript will be supplemented when made available.

c. **The OPLA Preempts Plaintiffs' Breach of Warranty Claim and Plaintiffs' Claim Should be Dismissed as a Matter of Law.**

The provisions of the OPLA, codified at O.R.C. §§2307.71--2307.80, govern any "product liability claim" brought under Ohio law.  Pursuant to O.R.C. §2307.71(A)(13), a "product liability claim" is defined as:

> "* * * a claim or cause of action that is asserted in a civil action pursuant to sections 2307.71 to 2307.80 of the Revised Code and that seeks to recover compensatory damages from a manufacturer or supplier for death, physical injury to person, emotional distress, or physical damage to property other than the product in question, that allegedly arose from any of the following:
>
> (a) The design, formulation, production, construction, creation, assembly, rebuilding, testing, or marketing of that product;
>
> (b) Any warning or instruction, or lack of warning or instruction, associated with that product;
>
> (c) Any failure of that product to conform to any relevant representation or warranty. * * *"

The OPLA affirmatively abrogates "all common law product liability claims or causes of action." O.R.C. §2307.71(B).

In *Miller v. Alza Corp.*, 759 F.Supp.2d 929, 943 (S.D.Ohio 2010), this Court held that while common law breach of warranty claims are abrogated by the OPLA, breach of warranty claims pursued under Ohio's codification of U.C.C., O.R.C. Chapter 1302, are not abrogated by virtue of O.R.C. § 2307.71(B).  However, plaintiffs are required to specifically plead reliance on U.C.C., O.R.C. Chapter 1302, to avoid abrogation.  This Court granted the defendants Motion for Summary Judgment in *Miller* and dismissed plaintiff's warranty claim for failure to plead reliance on the enactment of the U.C.C.:

> The Court agrees with Defendants that nothing in Plaintiff's Complaint indicates that the warranty claims are being pursued under O.R.C. Chapter 1302. Not only does the Complaint not cite Ohio's codification of the UCC, Plaintiff's Response to Defendants' Motion fails to identify the specific UCC sections under which the warranty claims are being pursued.

*Id.* at 944. Similarly, in *Donley v. Pinnacle Foods Group*, LLC, 2009 U.S. Dist. LEXIS 120503, *9-10 (S.D. Ohio Dec. 28, 2009), this Court also held that a plaintiff's failure to reference the U.C.C. in pleadings bars claims for breach of warranty as they are statutorily abrogated under the OPLA. Thus, unless plaintiffs actually plead breach of warranty claims in reliance of U.C.C, O.R.C. Chapter 1302, any breach of warranty claim is viewed as an abrogated common law claim and summary judgment is appropriate. See *Miller,* 759 F.Supp.2d at 944, see also, *Donley,* LEXIS 120503 at *9-10.

Here, Plaintiffs are relying on a design defect theory to seek compensatory damages under the breach of warranty claim to property other than the vehicle itself.  Complaint, ¶57 ("By designing, manufacturing, assembling, distributing, selling, leasing and/or supplying the [Vehicle], **in a defective and unreasonably dangerous condition, as set forth above**, the defendants breached their implied warranties.") (emphasis added).  However, nothing in Plaintiffs' Complaint indicates that the warranty claims are being pursued under O.R.C. Chapter 1302.  Furthermore, Plaintiffs had the opportunity to clarify any reliance on Chapter 1302 in Plaintiffs' Opposition to Defendants' Motion for Summary Judgment, but failed to do so.  As this Court has already held in both *Miller* and *Donley,* Plaintiffs' failure to identify any reliance on the U.C.C., O.R.C. Chapter 1302, requires this Court to view their breach of warranty claim under the common law.

Therefore, Plaintiffs' breach of warranty claim qualifies as a "product liability claim" under O.R.C. §2307.71(A)(13) and is preempted by the OPLA.  O.R.C. §2307.71(B) (stating that O.R.C. §§2307.71-2307.80 "are intended to abrogate all common law product liability claims or causes of action").[5]  Plaintiffs' breach of implied warranty claim should be dismissed as a matter of law.

---

[5] See also, *Thompson v. Sunbeam Prods.*, 503 Fed. Appx. 366, pgs. 36-38 (6th Cir. 2012)(common law implied warranty claims are abrogated by the OPLA); *Miles v. Raymond Corp.*, 612 F.Supp.2d 913, 917-924 (N.D. Ohio 2009)(common law product liability claims of breach of implied warranties were abrogated by the OPLA.); *Luthman v. Minster Supply co.*, 3rd Dist. Case No. 2-06-43, 2008 Ohio 165, 2008 WL

## III.    CONCLUSION

For the foregoing reasons, Defendants' Renewed Motion for Judgment as a Matter of

Law should be Granted and all of Plaintiffs' claims should be dismissed with prejudice.

Respectfully submitted,

/s/ Lawrence A. Sutter
Lawrence A. Sutter (0042664)
John R. Conley (0084079)
Sutter O'Connell
3600 Erieview Tower
1301 east 9th Street
Cleveland, Ohio 44114
Phone: (216) 928-2200
Fax: (216) 928-4400
lsutter@sutter-law.com
jconley@sutter-law.com
*Attorneys for Defendants, BMW of*
*North America, LLC and Bayerische*
*Motoren Werke AG*

---

169999 at *7 (Ohio App. Jan. 22, 2008)(OPLA preempts implied warranty of merchantability and fitness
for a particular purpose claims).

## CERTIFICATE OF SERVICE

I hereby certify that on this 6th day of July, 2015, Defendants' Renewed Motion for Judgment as a Matter of Law was filed electronically.  Notice of this filing will be sent to all parties by operation of the Court's electronic filing system.  Parties may access this filing through the Court's system.

/s/ Lawrence A. Sutter
Lawrence A. Sutter (0042664)

1    higher on the exhaust manifold.  It's got to be down on the

2    pipes.

3    Q    If it drops down on the pipes and catches on fire,

4    then your design wouldn't have made any difference?

5    A    I think it would.

6    Q    This alternative design that you have proposed, I'm

7    wondering why you didn't bring that design in with you,

8    sir.

9    A    The last thing I saw, it was at SEA.

10   Q    The last time you saw it was at SEA?  And this bracket

11   that you've made, this is made out of some type of a steel

12   or metal alloy?

13   A    It is.

14   Q    It is.  And you designed this yourself?

15   A    Yes.

16   Q    And you welded it yourself?

17   A    Yep.

18   Q    And put it together yourself?

19   A    It's braised, this one is.

20   Q    Braised, not welded?

21   A    Correct.

22   Q    Now, this design that you have put together, my

23   understanding is that you put it on a vehicle, right?

24   A    We put it on the exemplar.

25   Q    But you never actually drove the vehicle with the

REALTIME DRAFT ONLY – NOT AN OFFICIAL TRANSCRIPT

EXHIBIT A

1    alternative design in place?

2    A    No, we didn't.

3    Q    You never even pulled it out of the parking place

4    where it was?

5    A    I put it on to make sure it fitted from designing it

6    at the shop?

7    Q    I understand that.  But the important question here is

8    whether you actually drove it with your part in place.

9    A    No.  This would be very early in the design.  You

10    would want to have one that was welded.  This was designed

11    to see if it fitted.  And then if it fits, the next stage

12    would be to design, build one that's welded and stronger

13    that would take the loads of driving.

14    Q    So the design that you have shown us is not in fact

15    the finished product?

16    A    No.  It's a concept.

17    Q    It's a concept.  It is in no way, shape or form ready

18    to be put on a production vehicle?

19    A    No.  You would want to determine if the holes are too

20    big, you could make them smaller.  You don't have to have

21    them as open as I designed it.  You just need openings to

22    stop debris from catching on there.

23    Q    So this particular design, it's never been tested?

24    A    No.

25    Q    Well, in order to replace the stiffener plate, we

1     would need to know whether it performs as well as the

2     stiffener plate that is currently there, would we not?

3     A     You would want to, yes.

4     Q     We would want to do perhaps some durability testing,

5     correct?

6     A     You could do that.

7     Q     And you'll admit that your alternative has never been

8     through durability test?

9     A     It would be if you -- if BMW wanted to use it, if they

10    found to be superior to their design, they could do that.

11    Q     Before somebody could say it's superior to anybody's

12    design, we've got to do some testing, don't we?

13    A     They can, yes.

14    Q     You have not done any testing?

15    A     I don't need to test it.  It's just to show what an

16    example could be if it had holes or like the new one

17    already has holes in it.

18    Q     We're going to talk about the new one.  Don't worry

19    about it.  My question to you is you've not done any

20    testing on what you claim to be a replacement part in order

21    to ensure the safety of the drivers and passengers of that

22    vehicle, have you?

23    A     I didn't claim it to be a replacement part.

24    Q     You admit that it is not a feasible alternative design

25    for this vehicle as it's currently configured?

1    A    It's in production, early preproduction stages.  So it

2    can be made into one the way you see it.

3    Q    That's not my question.  Answer my question, please.

4    You admit that the design as you currently have it and it's

5    configured is not a feasible alternative design to be put

6    in a vehicle?

7    A    As it is today?

8    Q    As it is today.

9    A    Not in its direct concept, no.  It needs to be

10   changed.

11   Q    The stiffener plate that is in place right now has

12   multiple functions in the BMW 328xi, does it not?

13   A    Yes.

14   Q    Is stiffens the front end.  And the reason for that is

15   because there is a front drive axle?

16   A    Correct.

17   Q    And you need that?  You need that stiffening in order

18   for the driving axle to work correctly?

19   A    You do need it to be stiffened, yes.

20   Q    And your alternative has never been put into a vehicle

21   and tested to see where it's stiff enough, has it?

22   A    No.  It's just a concept.

23   Q    And likewise the current stiffener plate provides

24   other benefits such as aerodynamics, correct?

25   A    Maybe.

```
1    Q    And airflow?

2    A    Maybe.

3    Q    And your concept, concept, has never been tested for

4    aerodynamics or airflow?

5    A    No.

6    Q    The stiffener plate helps regulate the thermodynamics

7    the vehicle or the internal temperatures, does it not?

8    A    That's what was claimed in depositions, yes.

9    Q    And one of the reasons it does that is because it is

10   solid in formation, holds the heat, correct?

11   A    Well, it doesn't.  We just agreed it's only a hundred

12   and some odd degrees.  It doesn't hold much heat at all.

13   Q    It holds the temperature inside the engine compartment

14   along with the underbody cover and hood seals, correct?

15   A    Correct.

16   Q    And obviously your design or your alternative or

17   concept with a bunch of holes in it is not going to do the

18   same job, right?

19   A    It's not going to hold the same amount of air inside

20   the area, no.

21   Q    And at least accordingly to BMW, the design of the

22   stiffener plate adds to fuel economy and lower emissions,

23   does it not?

24   A    That's what they claim, yes.

25   Q    And you have done no testing or no studies whatsoever
```

1    in order to determine whether or not your concept would

2    have the same fuel savings or emissions savings, have you?

3    A    I have not.

4    Q    Likewise, there's been no crash testing?

5    A    No.

6    Q    No sled testing?

7    A    No.

8    Q    No testing what would have the vehicle comply with the

9    federal motor vehicle safety standards of the United States

10   of America, correct?

11   A    Correct.

12   Q    Let's talk about the F30 platform.  You showed these

13   folks a picture of the F30 platform, correct?

14   A    We did.  Yes.

15   Q    First off, this is a completely different design than

16   the 328xi, correct?

17   A    It's a new design, yes.

18   Q    And this particular stiffener plate and underbody

19   cover does not have NACA vents, does it?

20   A    No, it doesn't.

21   Q    Instead of NACA vents, there is a hole where the front

22   differential comes through?

23   A    Correct.

24   Q    That hole -- this is an I think pen that is being used

25   to point down there.  Is probably only in the neighborhood

```
 1    of four inches wide and eight inches long?

 2    A    Something like that, yeah.

 3    Q    And in fact, the hole is filled in by the differential

 4    itself?

 5    A    It's in the area so you can get to the drain plug.

 6    Q    And having that hole there does the same thing that

 7    the NACA vent does on the 328xi in that it channels air

 8    over the differential to cool it, correct?

 9    A    That would be my idea of what it's doing, yes.

10    Q    Now, you have never actually seen a 328i in person,

11    have you?  I'm sorry, that was a terrible question and I

12    used the wrong model.

13         You have never seen any of these vehicles, all-wheel

14    drive F30 platform at all, have you?

15    A    I have not, no.

16    Q    You've never looked at one from the underside?

17    A    Only on the pictures that we've got.

18    Q    The only thing you've ever done is look at a picture?

19    A    Correct.

20    Q    You've not seen the design plans?

21    A    No.

22    Q    You've not done any testing on the F30?

23    A    No.

24    Q    You've not seen the airflow testing or aerodynamics?

25    A    No.
```

REALTIME DRAFT ONLY – NOT AN OFFICIAL TRANSCRIPT

1    Q    You don't know any differences between the F30 and the

2    328xi as you sit here today as far as airflow, aerodynamics

3    or any of the effects of the difference in the stiffener

4    plate?

5    A    I do not.

6    Q    Likewise, you were shown a packet of pictures

7    involving what he called peer vehicles.  Do you remember

8    seeing those?

9    A    Yes.

10    Q    In opening statement, the jury was told that you did

11    an extensive review and research into these peer vehicles.

12    That's not true at all, is it?

13    A    I went through all of those pictures and spent time

14    examining them, yeah.

15    Q    You saw a bunch of pictures, right?

16    A    Right.

17    Q    In fact you never saw a single one of these vehicles

18    in person?

19    A    No.  No.

20    Q    You never lifted a single one of them up on a rack and

21    took a look underneath them?

22    A    No.

23    Q    Now, the photographs that you were shown of these

24    vehicles, did you know that the underbody cover had been

25    removed from several of those vehicles?

1    A    I didn't know that.

2    Q    Wasn't it part of your photographs?  The set of

3    photographs has several of the underbody covers taken off

4    and sitting to the side?

5    A    I didn't see those.

6    Q    Would that be important to you before you testify that

7    there are openings in these vehicles that would prove that

8    the 328xi is defective?

9    A    No.

10   Q    That wouldn't be important to you?

11   A    No, because they're your examples or your exemplars,

12   your showing other vehicle manufacturers.  We're concerned

13   with the XI.

14   Q    So you're not using these to support your opinion at

15   all?

16   A    I am.  On some of those I'm showing where the holes

17   are around the exhaust system.

18   Q    Don't we need to know which ones have the underbody

19   cover on and which ones don't?

20   A    I didn't know the covers had been removed.

21   Q    Mr. Clarke, the truth of the matter is that you are

22   not a design engineering at all?

23   A    I'm not a design engineer, no.

24   Q    Your job has never been to design vehicles for

25   production, automobiles, anywhere in the world?

```
 1    A    Not production vehicles, no.

 2    Q    You've never designed an underbody cover for a

 3    production vehicle?

 4    A    I have not.

 5    Q    You've never designed a stiffener plate for a

 6    production vehicle?

 7    A    I have not.

 8    Q    In fact, you have no education in vehicle

 9    aerodynamics?

10    A    Correct.

11    Q    And the degree that you have over in England is not

12    the same as an engineering degree in the United States?

13    A    It's not, no.

14    Q    And in fact, in England there are several different

15    categories for professional engineers and titles, are there

16    not?

17    A    There are, yes.

18    Q    And there -- several of them are professional

19    engineer?

20    A    Correct.

21    Q    Engineering technician?

22    A    Yes.

23    Q    Incorporating engineer?

24    A    Yes.

25    Q    And I think chartered engineer?
```

```
 1     A     Yes.

 2     Q     The truth is, sir, you are not any of those?

 3     A     I don't have a PE, no.

 4     Q     And you are not a licensed engineer in the United

 5     States of America?

 6     A     I am not.

 7     Q     Not in Ohio?

 8     A     I think Ohio is in the United States.

 9     Q     And certainly not in Georgia where you live?

10     A     Correct.

11     Q     You have no formal education in the field of

12     automotive engineering?

13     A     The only automotive engineering I took is when I was

14     in England.

15     Q     And you took one class?

16     A     I took it for four years.

17     Q     Well, I thought you just told us that is not an

18     engineering degree as it is in the United States?

19     A     That's how I understand it.  It's a four-year course

20     in automotive engineering.

21     Q     You have never written an article on the concept of

22     self-cleaning, have you?

23     A     No, I have not.

24     Q     You've never submitted it to a group of other experts

25     in your field?
```

```
 1    A    No.  This is the first case I've come across.

 2    Q    And you certainty haven't had anything peer reviewed

 3    by your compatriots in the field, have you?

 4    A    Of self-cleaning.

 5    Q    Self-cleaning?

 6    A    No.

 7    Q    In fact, you don't know of any other article involving

 8    self-cleaning that has been published in the United States?

 9    A    I haven't found one, no.

10    Q    Just to make sure we all understand your background,

11    you listed off several companies that you worked for and

12    you said that you worked as a design engineer or that your

13    title was a design engineer, I believe.

14    A    No.  Development.

15    Q    Development engineer.  When you worked at Philip dole

16    Mercedez, your job was repair and maintenance, correct?

17    A    I was shop foreman.

18    Q    That had no design responsibilities none whatsoever?

19    A    None whatsoever.

20    Q    When you worked at HE Everal limited, again, you had

21    no design responsibilities?

22    A    No.

23    Q    And when you worked at Norfolk motor company, you once

24    again had no design responsibilities?

25    A    No.
```